## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GWENDOLYNNE S., through her      :
Parents JUDY S. and      :
GEOFF S. of West Chester, PA,      :
     :    Civil Action
     Plaintiffs      :
     :
v.      :    No.
     :
WEST CHESTER AREA      :
SCHOOL DISTRICT      :
782 Springdale Drive,      :
Exton, PA 19341,      :
     :
     Defendant      :

## COMPLAINT

## I.      Preliminary Statement

1.      This action is brought by Gwendolynne S. ("Gwen"), a minor child with disabilities, and her Parents, Judy S. and Geoff S. (collectively referred to as "Parents," "Plaintiffs," or the "Family"), against Defendant West Chester Area School District (the "District"), under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, et seq., and its federal and state implementing regulations; Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, and its federal and state implementing regulations; the Americans With Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, et seq., and its federal and state implementing regulations; and Chapters 14 and 15 of the Pennsylvania Code.

2.      At all relevant times, the District failed to appropriately evaluate and identify Gwen, find her eligible for special education under IDEA and/or accommodation under Section 504, and provide her with an appropriate program and placement, in violation of IDEA, Section

1

504, and the ADA.

3.      Gwen struggles to read, write, and remember the rules of written language. Her memory in general is well below average. Her standardized and individualized testing consistently shows severe deficits in these areas, though not in others. Despite an average full-scale IQ, her scores on the Pennsylvania System of School Assessment ("PSSA") in these areas are consistently deficient, as are her District Benchmark writing assessments. Samples of her schoolwork demonstrate far more mistakes than an average child of her age and/or grade. She is self-conscious about her disability, tries to hide it, and is extremely anxious about it. Gwen's academic challenges, specifically in the areas of reading and written expression, have been long-standing and continuous since her enrollment in the District as a second-grade student, in the fall of 2015.

4.      Gwen has been denied the Free and Appropriate Public Education ("FAPE") to which she is entitled from the time she enrolled in 2015-16, her second grade year, to the present. Gwen was provided extra reading support during her initial kindergarten year at a parochial school. She then repeated kindergarten and attended first grade at a second parochial school with support continuing but with greater frequency. After her first-grade year in the second parochial school (2014-15), her parents enrolled her in the District, believing additional support could be provided in the public setting.   In preparation for a fall enrollment, in the spring of 2015, Parents asked the District to evaluate Gwen for IDEA eligibility, providing her full educational history and their reasons for intending to enroll her -- to address her academic struggles. The District refused to evaluate her.

5.      Commencing with her District enrollment, but without an evaluation, Gwen was removed from her regular classroom for Title I Reading Support (a regular education program) for

at least 30 minutes, four to five times per week, every week, in a gradual escalation of regular education interventions,[1] in addition to giving her other one-on-one reading support. Throughout her enrollment and at District recommendation, Parents obtained private tutoring at their own expense. The District thus tacitly and informally acknowledged Gwen's disability, but has used its long-term maintenance of Title I reading support as a shield against providing Gwen with the more comprehensive support and protections available under IDEA and/or Section 504.

6.      "Strategies" taught to Gwen in this pull-out support include re-reading text; looking back; asking clarifying questions; and double- and triple-checking her work – all of which exacerbate the fact that she is acknowledged to be a slow worker who needs extra time, especially on any timed tests. Because the District refuses to recognize her disability, she has not been provided extra testing time, resulting in increased pressure and anxiety. Despite Gwen undertaking

---

[1] This is, in effect, an Response to Intervention ("RTI") approach, under which:

> All children receive Tier 1 instruction, but those children in need of supplemental intervention receive additional instruction at Tier 2 or Tier 3. Tier 2 consists of children who fall below the expected levels of accomplishment (called benchmarks) and are at some risk for academic failure but who are still above levels considered to indicate a high risk for failure.
> * * *
> Tier 3 consists of children who are considered to be at high risk for failure and, if not responsive, are considered to be candidates for identification as having special education needs. The groups of students at Tier 3 are of much smaller sizes, ranging from 3 to 5 children, with some models using one-to-one instruction.

"Tiered Instruction and Intervention in a Response-to-Intervention Model," by Edward S. Shapiro, Center for Promoting Research to Practice, Lehigh University, Bethlehem, PA, at: http://www.rtinetwork.org/essential/tieredinstruction/tiered-instruction-and-intervention-rti-model. In Pennsylvania, school districts must be State-approved to use an RTI approach; however, it was stipulated at the hearing that the West Chester Area School District is not approved to use RTI. Decision at 4.

an overload of extra work with her older sister, Parents, and Parent-paid private tutors, plus years of District extra support, Gwen has never performed in a manner consistent with her cognitive profile in the areas of reading and written expression. Gwen is self-conscious of, and embarrassed by, her disability. As a result of this extra labor and difficulty, Gwen has developed a Generalized Anxiety Disorder about school, testing, and her Specific Learning Disability.

       7.      Over the years, Gwen's reading and writing have never been consistent with objective grade-standard measures, but District teachers have puzzlingly given her high report-card grades in language arts. Gwen's grades are subjective, unreliable, and cannot be accepted as a true measure of her performance, or absence of a disability. Subjective grades do not reflect her consistently extreme, long-term errors in spelling, her lack of awareness of proper written language usage, her substitution of d for b (and vice-versa), her difficulty in reading comprehension, and other language problems. Her grades are a reflection of her persistence, politeness, good behavior, and conscientious work.   The subjective grades are at odds with the objective evidence showing her low performance on state-wide, grade-normed tests and normed psychoeducational evaluations, as well as with samples of her actual schoolwork.

       8.      The District finally evaluated Gwen after the Parents' repeated request. The District's Evaluation Report ("ER"), dated 11/14/17, by District psychologist, Peggy Katsouros, Ed.S., wrongly found Gwen not eligible for special education under IDEA. The ER was incomplete, internally inconsistent, and incorrect. Its troubling findings included objective assessments that Gwen's phonological awareness was more than two years behind and that her normed scores on various reading and writing subtests were extremely low. Her Woodcock-Johnson Spelling level was in the seventh percentile. Many of her Feifer Assessment

of Reading ("FAR") subtests showed "absolute weakness" in a number of early literacy skills. The ER showed weakness in the areas of Gwen's language disability as compared with her full-scale average IQ yet concluded she is not a student with a disability. To excuse this error, the ER relied mainly on Gwen's subjective high grades, hard extra work in areas of her disability, performance in the Title I reading support program, and average competence in other areas.

9.      Concerned with the findings in the ER, the Family sought and paid for an independent assessment of Gwen. The Independent Educational Evaluation ("IEE") by stipulated expert Kara Stutz Schmidt, Ph.D., diagnosed Gwen with a Specific Learning Disability ("SLD") under IDEA in reading and spelling/written language, plus Generalized Anxiety Disorder ("GAD") requiring specialized instruction and Section 504 accommodations. The IEE included specific recommendations for developing a program and placement for Gwen, including research-based intervention in a one-on-one or small-group setting; related specially-designed instruction, supports, and accommodations; and Extended School Year ("ESY") services.

10.      When the Parents and District met to review the IEE, the District failed to meaningfully consider its results. It was not willing to identify Gwen's language needs as a disability.   Instead the District opted to undertake its own 504 eligibility determination, specific to the anxiety identified by Dr. Schmidt.   The District issued a 504 Evaluation Report denying accommodation dated November 14, 2018, and finalized it the following day. There was no meeting with the Parents to review these findings, and the District's 504 evaluation did not include any assessment of Gwen by the District's team.

11.      Gwen's Parents filed an administrative Due Process complaint with the Pennsylvania Office for Dispute Resolution ("ODR"), seeking relief for the District's violations,

including: identification of Gwen as a student with a disability; development of an appropriate program and placement for her per the IEE; reimbursement for the costs of the IEE and private tutoring; full days of compensatory education from the date on which Gwen entered the District; and reasonable attorney's fees and costs. After a two-day evidentiary hearing, the presiding Hearing Officer, James Gerl, Esquire, issued a factually and legally erroneous written decision and order, denying all relief to Gwen and the Family. ODR No. 21170/18-19-KE (May 27, 2019) ("decision").

12.     The decision was incorrect in a plethora of ways. It should be reversed by this Court, and appropriate relief should be awarded to the Family. Among other things, the Decision erred in failing: (1) to find Gwen eligible for special education under IDEA and/or for accommodation under Section 504; (2) to conclude that the District violated its obligations to identify Gwen as a child with a disability (known as "Child Find"); (3) to find that the District is obliged to provide compensatory education; (4) to find the District responsible for compensating the Family for the IEE obtained and paid for by the Parents due to the District's inadequate ER; and (5) to reimburse the Family for the many years of private tutoring the Family obtained (at times at the District's request).

13.     Amongst its many flaws, the Decision included many unsupported, inaccurate, and inappropriate findings. For example, it states that the Parents' due process complaint letter "was inartfully drawn[,] appearing to have been cobbled together from a formbook", decision at 3. This statement is demonstrably false and offensive. The Family's due process complaint letter is an articulate and professional pleading. Exhibit S-17.

14.     The Decision grossly mischaracterized the ER and the IEE in myriad ways, detailed

below. For example, it states that the IEE "looked at the student through a medical lens" and focused on "the student's weaknesses," while the ER "looked at the student through an educational lens" and "at the overall performance of the whole student." The evidence is contrary to these inaccurate statements, and supports the exact opposite conclusion.

15.     The ER found weaknesses in Gwen's areas of disability, then dismissed them with no rational basis. The ER, and the Decision, wrongly credited Gwen's subjective classroom language arts grades more than normed, objective assessment scores in her areas of weakness that are lower than expected given her average intelligence, and found that her hard work in and out of school to keep up with her slow reading group, her resultant good grades, and her good behavior, means she must have no disability. This is gross error.

16.     The Hearing Officer's choices to afford the ER more weight than the IEE, and to find the testimony of Ms. Katsouras more persuasive than that of Dr. Schmidt, wrongly rested on these erroneous and factually mistaken mischaracterizations. Therefore, those determinations must also be rejected. Due to the Hearing Officer's grossly inappropriate, incorrect, and wrongly-grounded determinations of the weight to be given to these evaluations, Parents respectfully request that this Honorable Court should itself hear live testimony from both experts and make its own credibility determinations.

17.     The Decision accepted the stipulation that the District "is not approved by the State to use the [R]esponse [T]o [I]ntervention model for identification purposes." Decision at 4. However, in finding that the District had not violated its Child Find duties, it relied heavily on the fact that the student was receiving long-term Title I Reading Support (designed to be a short-term *regular education* supplement using RTI elements) and good grades. In effect, the Decision

overruled the State by allowing the District to use a RTI model to determine IDEA eligibility. This is entirely impermissible and is clear error.

18.     The Decision also egregiously and outrageously found that "the appropriate remedy for a Child Find violation would consist *only* of an order to evaluate the child." Decision at 22 (emphasis supplied). This shows an extreme and fundamental misunderstanding of the law. Under this logic, if a School District fails to provide services to a child with disabilities for years because it failed to ever evaluate and identify the child, the only remedy would be an evaluation -- not compensatory education or tuition reimbursement. That, however, is directly contrary to *hundreds* of cases that grant compensatory education and tuition reimbursement for Child Find violations. It is contrary to the unequivocal statement of the United States Supreme Court that "a reading of the Act [IDEA] that left Parents without an adequate remedy when a School District unreasonably failed to identify a child with disabilities would not comport with Congress' acknowledgment of the paramount importance of properly identifying each child eligible for services." Forest Grove School District v. T.A., 557 U.S. 230, 245 (2009).

19.     These are but a few of the Decision's egregious and fundamental errors. More are set forth below.

20.     This Court is required to undertake an independent review of the record and the decisions of the Hearing Officer. Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 206-07 (1982); Susan N. v. Wilson School Dist., 70 F.3d 751, 759 (3d Cir. 1995).

21.     After fully considering the entire record, this Court should reverse the incorrect Decision of the Hearing Officer and award appropriate relief to the Family for the District's

8

educational failures, including costs of the IEE and expert testimony, compensatory education, tutoring reimbursement, and reasonable attorneys' fees and costs.

## II.    Parties

22.    Gwen was born in 2007, and at all relevant times resided in West Chester, Pennsylvania, within the geographical boundaries of the District. Judy S. and Geoff S. are Gwen's Parents. At all times relevant to this action, they have resided with Gwen in West Chester, Pennsylvania.

23.    The District is located at 782 Springdale Drive, Exton, Pennsylvania. The District is the recipient of several sources of federal funds and is an educational agency designated by Pennsylvania law and the Pennsylvania Department of Education for the provision of educational services to individuals residing within its boundaries. Such services include those mandated under IDEA as well as Pennsylvania's statutory/regulatory scheme concerning young children with disabilities. 11 P.S. § 875-101; 22 Pa. Code §§ 14.131 - 14.133; see also, e.g., 24 P.S. Chapter 13; and 22 Pa. Code Chapters 14 and 15.

## III.    Jurisdiction and Venue

24.    This Court has original jurisdiction over this appeal pursuant to 28 U.S.C. § 1331 because this case raises federal questions under the IDEA, Section 504, and the ADA.

25.    Plaintiffs have exhausted their administrative remedies where required under 20 U.S.C. § 1415(i), having timely pursued a Special Education Due Process hearing.

26.    Plaintiffs' claims and remedies are authorized by 20 U.S.C. § 1415, and 28 U.S.C. §§ 2201 and 2202, providing for declaratory and any further relief deemed necessary and proper.

27.    All of the Defendant's actions complained of herein have taken place within the

jurisdiction of the United States District Court for the Eastern District of Pennsylvania. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391.

## IV.     Additional Facts Supporting Liability

28.     Gwen is currently a rising sixth-grade student, but because she needed to repeat kindergarten due to her demonstrated weakness in early reading skills, she is one year older than her grade-level peers. As a District fourth-grader in 2017-18, she was assessed by Dr. Schmidt, a dual certified Ph.D. neuropsychologist and school psychologist, and Ms. Katsouros, a District psychologist. They both found Gwen had average intelligence, but they differed on whether Gwen had a disability.

29.     Gwen is considered a hard worker, pleasant, and does not present with externalizing behaviors that interfere with her or her peers' learning.

30.     It is undisputed that the District aims for students to demonstrate proficiency on the PSSA, an objective, annual assessment administered commencing in third grade to all students that is designed to measure performance against published grade standards of areas of reading and math. As Gwen is a student of average intelligence, she should demonstrate proficiency on this standardized assessment. However, Gwen has never demonstrated proficiency in reading as measured by the PSSA.

31.     The District has adopted the Pennsylvania Common Core Standards and acknowledges that annual Benchmark progress for a typical student is a year of growth in a year's time. Gwen *has yet to* produce a written reading/writing Benchmark consistent with a proficient score. The District also considers the published K-5 English/Language Arts Pennsylvania grade standards as part of the IDEA/Section 504 eligibility process, and the District acknowledges an

10

expectation that students should be instructed on their current grade level.

32.     For each of the four years of Gwen's enrollment in the District, Parents received a letter indicating that she ***required*** "additional" reading support due to standardized test results. During each of those years, Gwen was removed from the general education setting almost every day for not less than thirty minutes to receive some type of support in reading. The support provided to Gwen while she was removed varied, and at times included: 30 minutes of "reading support"; 30 minutes of "comprehension" support plus 15 minutes of "decoding"; or, most recently, as of January 2019, "direct instruction" with writing strategies. Pull-out support provided to Gwen by the District in 2015-16, 2016-17, 2017-18, and from September of 2018 to January 9, 2019, did not include support for writing.

33.     The almost four full years of ***at least 4320 minutes of support per year*** provided to Gwen outside the general education setting did not consist of a sequential, needs-specific program of interventions in reading and writing, as required by IDEA. Gwen instead received a variety of piecemeal programs, including: "Words Their Way" for two years; Project Read for one year; portions of MegaWords; and part of Jerome Rosner's Phonemic Awareness Program. The information regarding Gwen's response to MegaWords was not provided to Ms. Katsouras during the District's evaluation. The District does not consider support provided outside of the general classroom daily, for years, to be an "accommodation."

34.     Throughout Gwen's four years of enrollment in the District, she was considered "at risk" in reading by her teacher, but the District never informed her Parents of this. Parents have attended parent-teacher conferences each school year. At no conference was data shared regarding Gwen's reading and writing performance and whether it met the applicable grade standard.

35.     Beginning in the 2015-16 school year and continuing to the 2018-19 year, a group of teachers (the Child Study Team, "CST") met to discuss Gwen's progress and levels in reading and her scores and assessment levels. The fact that such meetings were occurring was not shared with Parents.

36.     Parents obtained extensive outside tutoring for Gwen, which is continuing.

37.     Gwen attended kindergarten at a parochial school and was retained, repeating kindergarten at a second parochial school, where she received more reading support.

38.     During enrollment at the second parochial school as a repeating kindergarten student, and the following year at the same school as a first-grade student, Gwen received pull-out support in reading on average two to three times per week by a reading specialist, plus two and one-half years of private tutoring (including summers).

39.     During Gwen's first year in the District, when she was a second-grader, the District informed Parents that Gwen was "meeting grade-level standards" per an informal, quick assessment, Dynamic Indicators of Basic Early Literacy Skills (DIBELS). However, records show the number of words correct per minute that Gwen could read was lower than expected, even on that cursory test.

40.     Data from 2015-16 demonstrated Gwen was not progressing in timed activities requiring her to read words correctly. Gwen had a "hard time" with comprehension, and written responses were "difficult" for her. Gwen did not demonstrate word fluency consistent with age- or grade-level standards. The last time that words correct per minute was measured that year was on March 30, 2016, even though she was not meeting age- or grade-level standards.

41.     At the end of her second-grade year, the District recommended Gwen for summer

school and for continued tutoring outside of school the following year. Instead, Gwen received tutoring from her District teacher that summer, and from other parent-paid tutors the following year.

42.     During Gwen's third-grade year (2016-17), the District was aware that Gwen found it necessary to go back and re-read lines, and that this adversely impacted her fluency. In that same year, data on Gwen's word fluency from early March 2017 through the end of the school year reflected regression. At the end of Gwen's third-grade year, she continued using "basic" and "inventive" spelling.

43.     As a third-grader, Gwen's writing clearly signaled she was a student experiencing difficulty.   She made many spelling errors; omitted word endings; omitted double consonants; used "sall" for " Saw"; deleted silent "e"; used "hol" for "hole"; and omitted vowels, e.g., "Flt" for "full". During third grade, at the time of these errors, Gwen received thirty (30) minutes of reading support outside of general education per day. However, no writing support was provided, nor were these difficulties considered by the District team in the context of IDEA or Section 504 eligibility. Given her average cognitive profile, these errors are consistent with those of a student with a specific learning disability. Gwen's third-grade writing Benchmark scores were below grade expectation. They were considered "basic" and not "proficient." Incredibly, she received a writing grade of 91 in class.

44.     Gwen's Parents raised concerns about her moving to fourth grade, but District personnel assured them that sufficient support would be provided.

45.     At the outset of the fourth grade, Gwen cried at school during a reading assessment of grade-level material and said she did not understand the task. The District's reading specialist

determined that her ability to silently comprehend material when she was not provided the text to look back at and review was 63%. She was not on grade-level, and her reading rate/ fluency of 60 words per minute was not consistent with grade level expectations. Gwen was removed from the general education setting for 30 minutes each day during fourth grade to receive support from a reading specialist. However, this did not include explicit support with writing.

46.     As a fourth-grade student, Gwen never scored proficient on Benchmarks in the areas of narrative or decision-writing. Gwen was the only student in her fourth-grade class to receive one-on-one phonics instruction. This was provided by her classroom teacher for ten minutes each day, using a program that could not be identified.

47.     The District was aware that Gwen was not performing at a proficient level in writing, that she performed at the "Basic" level, and that the District's evaluation report processes did not contain any test to ascertain whether Gwen had moved beyond the "Basic" level.

48.     On September 4, 2017, Parents made a second request for a written evaluation under IDEA. The District then produced its Evaluation Report ("ER"), dated November 14, 2017. For it, *inter alia*, Ms. Katsouras observed Gwen for 30 minutes during a reading activity. During that short time, Gwen requested clarification on four separate occasions. Ms. Katsouras observed that to respond to a class activity, Gwen read a paragraph, scanned it again, re-read it after a teacher prompt, then had the teacher read the same paragraph with her. The District ER did not include a review of Gwen's consistently "Basic" performance on existing and available third- and fourth-grade writing Benchmarks. The ER's evaluation for written expression included four subtests that did not analyze or assess Gwen's competencies in basic writing skills such as spelling and punctuation. Ms. Katsouras was unaware of the fourth-grade writing expectations. She was

also unaware of the specific materials used by Gwen's current teacher and reading specialist, and she was not aware of the specific "targeted" interventions that Gwen was receiving. The District's ER did not include review of data pertaining to Gwen's academic performance in comparison to grade-level standards.

49.     The District acknowledges that although Gwen is solidly within the average range of intelligence, with a Full-Scale IQ of 101, she demonstrates statistically significant scatter and several significant deficits between/among visual, spatial and verbal comprehension subtests of greater than one standard deviation. Although she is a student with average intelligence, Gwen cannot perform verbal fluency tasks that are consistent with age expectations. Ms. Katsouras was aware that Gwen had been retained as a kindergartner.

50.     As part of the ER, the District administered the FAR. Despite average intelligence, Gwen demonstrated "absolute weakness" in four of its areas: 1) Nonsense Word Decoding; 2) Isolated Word Reading Fluency; 3) Visual Perception; and 4) Silent Reading Fluency Comprehension. When Gwen was required to silently read text, and then to answer questions without access to that text, she scored in the 10th percentile of the FAR.   Gwen's ability to decode long, multisyllabic nonsense words is in the 4th percentile, which is well below expectations given Gwen's average ability levels.

51.     The District also assessed Gwen's knowledge of phonics rules and structures through a teacher-administered assessment, in which Gwen demonstrated she was not performing on grade level. The District acknowledges that Gwen accesses text at a slow rate.

52.     The ER included the Woodcock-Johnson Test of Achievement, a standardized, norm-referenced assessment. Gwen scored in the seventh percentile of its spelling section.

53.     Despite the significant discrepancy between Gwen's average ability level and below-average academic performance – especially in light of the significant additional in-cool and private support she was receiving – the District ER incredibly determined that Gwen has no disability under IDEA, and that she requires no Specially Designed Instruction. The District also found Gwen ineligible for 504 accommodations. The Parents disagreed with the District's conclusions.

54.     The ER provided to the Parents was incomplete and did not include an observation section. Parents learned for the first time that the District psychologist actually did perform a brief observation when the ER was produced as part of the administrative proceeding.

55.     The District ER, and the separate District 504 evaluation conducted after the IEE, did not include a clinical interview of Gwen for Generalized Anxiety Disorder (GAD). Nor did it include input from Gwen on feelings about school.

56.     Given their disagreement with the District's ER, the parents obtained an independent evaluation by Dr. Kara Schmidt, a highly experienced, respected, licensed and school-certified neuropsychologist.

57.     The IEE administered 11 subtests of the Kaufman Test of Educational Achievement, Third Edition (KTEA-3), and the Gray Oral Reading Test (GORT). (In contrast, the ER included one subtest from the KTEA-3.)

58.     Dr. Schmidt included in her data both timed and untimed performance by Gwen, and analysis of her errors. The errors and the scores are inconsistent with performance by a same-aged, typically-developed peer. Dr. Schmidt's IEE testing results indicate that Gwen exhibited decoding, accuracy, and reading fluency and comprehension in the low average range as

a fourth-grade student. She demonstrated delays in word retrieval and recall, with reading comprehension in the low average to borderline range.

59.     Gwen's efficiency, i.e., rate of oral reading fluency and comprehension, were assessed by Dr. Schmidt using the GORT. The results for Gwen, a then-fourth-grader, were found to be consistent with that of a typical *second-grader*. Dr. Schmidt's findings and assessments in the IEE are consistent with those of a student with a learning disability.

60.     Dr. Schmidt noted that the District's FAR assessment shows that Gwen's ability to read isolated words fluently is in the *seventh* percentile. Further, Gwen demonstrated deficiencies in the ability to read with automaticity and, to some degree, with math facts.

61.     Dr. Schmidt administered the Test of Written Language (TOWL 4). Gwen, as a fourth-grade student, demonstrated contextual conventions below third-grade level, receiving a standard score of 6. She demonstrated spelling mistakes, run-on sentences, structural errors, lack of morphology, and incorrect word endings.

62.     When Gwen was assessed by Dr. Schmidt, her performance on a fourth-grade writing Benchmark demonstrated the following challenges, which are indicative of a student with a learning disability:   word problems; confusion between the letters b and d; misspellings; improper grammatical structure; and problems in orthographic retrieval and consistency. Dr. Schmidt's assessment showed that, as a fourth-grade student, Gwen had decoding fluency skill in the 1st percentile.

63.     Dr. Schmidt observed Gwen in the classroom on March 21, 2018. When students were given verbal instruction once with written instructions available, Gwen did not undertake the assignment for eight minutes and did not alert the teacher to her need for assistance. Dr. Schmidt

observed that she had difficulty retrieving information.

64.     Dr. Schmidt's report included age norms, age expectations, grade-level expectations, and standard scores.

65.     Gwen demonstrated skill regression when assessed by a District teacher at the beginning of the 2018-19 school year. On September 17, 2018, Gwen's reading fluency was 88 correct words per minute, and her silent comprehension without lookbacks was 63%. These scores are inconsistent with Gwen's average intelligence and are not consistent with grade or age expectations.

66.     Gwen's fifth-grade District teacher did not provide one-on-one instruction in phonics, even though Gwen's fourth-grade teacher testified that he had provided this support during the previous year.

67.     School-based work by Gwen from December of 2018, while she was a fifth-grade student, reflects improper use of: is/are; to/too; and though/through. She repeated these errors outside of school. Classwork by Gwen during fifth grade reflects an inability to correctly spell three-syllable and two-syllable words such as Atlantic, Indian, Southern, and Africa. These errors are inconsistent with her average cognitive profile but are consistent with being eligible as a student with a specific learning disability, as reflected by her decoding, retrieval, and sequencing errors. Classwork by Gwen that year also reflects errors that are the result of deficits in her ability to retrieve orthographic information and that are not consistent with responses of a typically-developed peer..

68.     On January 10, 2019 -- after the first due process hearing session in this matter -- the District decided, without Parent involvement, to provide Gwen for the first time with "direct

instruction with writing strategies."

69.     At home, Gwen becomes emotional when falling asleep before school tests and asks a parent to hold her hand. As a fifth-grader, Gwen needed a teacher to be present during testing so that she could ask questions during the assessment. She became visibly upset if a substitute was, or was planned to be, present. Gwen was observed to bite her nails during assessments. She self-reports feelings of anxiety. She cries at home about school. She has shared that she is anxious about tasks at school.

70.     Dr. Schmidt concluded that Gwen is a child with GAD, per the Diagnostic and Statistical Manual 5 ("DSM-5"), and per reports of Gwen and her Parents. Dr. Schmidt relied on multiple factors in making this conclusion, including a comprehensive clinical interview and a specific inventory developed to evaluate anxiety. GAD is an internalizing process the presence of which is difficult to assess based solely on observations. Rating scales based on visible presentation of a student cannot accurately determine its presence.

71.     Gwen reported to Dr. Schmidt that she worries when at school; that her hands and body shake; that she has trouble doing things; that her stomach hurts; and that she has trouble sleeping. Based on Gwen's self-report, Gwen scored in the elevated range for anxiety on the Beck Youth Inventory. Gwen experiences anxiety during homework, and she cries when she does not understand the work.

Gwen does not use texting on her phone to communicate with her peers because she is aware of her spelling and usage deficits and is concerned her peers will discover this about her.

72.     On January 3, 2018, Parents alerted Gwen's fourth-grade teacher that Gwen was embarrassed to raise her hand in class. On October 24, 2018, Parents notified Gwen's fifth-grade

teacher that certain reading homework was too challenging.

73.     The District's Section 504 ER finds Gwen has no GAD and does not qualify for accommodation under Section 504. Parents were presented with this ER without a formal team meeting or conversation. Instead, the 504 non-eligibility ER was mailed to the Parents at home on November 15, 2018.

## V.     Legal Authority

74.     The purpose of the IDEA is to ensure that "all children with disabilities have available to them a free and appropriate public education ["FAPE"] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). IDEA and the regulations thereunder, 34 C.F.R. §§ 300.100 et seq., and 22 Pa. Code Chapter 14, require that public School Districts provide disabled children with a FAPE, as well as extensive Due Process procedures to effectuate that right.

> "The IDEA protects the rights of disabled children by mandating that public educational institutions identify and effectively educate those children, or pay for their education elsewhere if they require specialized services that the public institution cannot provide." P.P. v. West Chester Area School Dist., 585 F.3d 727, 735 (3d Cir. 2009). Accordingly, schools must: (1) identify children in need of special education services (Child Find); and (2) provide a FAPE to disabled students.

D.K. v. Abington Sch Dist., 696 F.3d 233, 244 (3d. Cir. 2012).

75.     The requirement that School Districts properly identify all eligible children is known as Child Find and is mandated under both IDEA and Section 504. 34 C.F.R. Sections 104.33 and 300.111; 20 U.S.C § 1412(a)(3)(A) and (B). See PARC v. Cmwlth., 343 F.Supp. 279 (E.D. Pa. 1972). Under these statutes and their regulations, School Districts have a continuing

obligation to properly evaluate and accurately identify all students who are reasonably suspected of having a disability. Ridley Sch. Dist. v. M.R., 680 F.3d. 260 (3d Cir. 2012) (citing P.P v. West Chester Sch. Dist., supra); Punxsutawney Area School District v. Kanouff, 633 A.2d 831 (Pa. Cmwlth. 1995); Ridgewood Board of Education v. N.E., 172 F.3d 238 (3d Cir. 1999); W.B. v. Matula, 67 F.3d 484 (3rd Cir. 1995); Palmyra Board of Education v. F.C., 2 F.Supp.2d 637 (D.N.J. 1998); T.B. v. School District of Philadelphia, 1997 WL 786448 (E.D.Pa. 1997). A district's Child Find obligations are triggered when there is a reason to suspect that the child may be disabled, and "a poorly designed and ineffective round of testing does not satisfy a school's Child Find obligation." D.K. v. Abington Sch Dist., 696 F.3d at 250 (citing G.D. ex rel. G.D. v. Wissahickon Sch. Dist., 832 F.Supp.2d 455, 465–67 (E.D.Pa. 2011) (finding the school's reevaluation of an elementary student with significant behavioral problems was inadequate because it overemphasized academic proficiency and assessed behavioral issues only cursorily)).

76.    As the Supreme Court recently reiterated, "We declined to hold in Rowley, and we do not hold today, that 'every handicapped child who is advancing from grade to grade … is automatically receiving a [FAPE].'" Endrew F. v. Douglas County School District RE-1, 137 S. Ct. 988, 1000, n.2 (2017) (quoting Rowley, 458 U.S. at 203, n. 25).

77.    Under the IDEA, an "appropriate education" is a series of services described in an IEP that is reasonably calculated to afford meaningful educational progress. Ridgewood, supra. The fundamental purpose of the IDEA is to ensure that "all children with disabilities have available to them a free and appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400 (d)(1)(A). IDEA and regulations

thereunder, 34 C.F.R. § 300.100 et seq., require public School Districts to provide disabled children with a FAPE.

78.     The IDEA provides that an IEP team, including school officials and the child's Parents, must develop an appropriate educational program and placement for each eligible child through an IEP. A two-pronged analysis applies in reviewing a School District's IEP development under the IDEA: (1) whether the District complied with the procedures set forth in the IDEA; and (2) whether the IEP developed through the IDEA's procedures is reasonably calculated to enable the child to receive *meaningful* educational benefit. Rowley, 458 U.S. at 206-7; Endrew F., 137 S. Ct. at 999; Shore Regional High School Bd. of Educ. v. P.S., 381 F.3d 194, 198 (3d Cir. 2004); Ridgewood, 72 F.3d at 247; Polk v. Central Susquehanna Intermediate Unit 16, 853 F.2d 171, 184 (3d Cir. 1988); Lauren W. v. DeFlaminis, 2005 WL 1353643, at *6 (E.D. Pa. June 1, 2005).

79.     The IEP is the cornerstone of the special education program for a student. Honig v. Doe, 484 U.S. 305, 311 (1988); Ridgewood, 172 F.3d at 247; W.B. v. Matula, 67 F.3d 484, 492 (3d Cir. (1995), abrogated on other grounds, A.W. v. Jersey City Public Schools, 486 F.3d 791 (3rd Cir. 2007); Polk, 853 F.2d at 173.

80.     It is the School District's *non-delegable* obligation to create an appropriate IEP. M.C. v. Central Reg'l School Dist., 813 F.3d 389, 397 (3d Cir. 1996) ("[I]t is the responsibility of the child's teachers, therapists, and administrators -- and of the multi-disciplinary team that annually evaluates the student's progress -- to ascertain the child's educational needs, respond to deficiencies, and place her or her accordingly."); Carlisle Area School Dist. v. Scott P., 62 F.3d 520, 533 (3d Cir. 1995); Fuhrmann v. East Hanover Bd. of Educ., 993 F.2d 1031, 1035 (3d Cir. 1993); P.S., 381 F.3d at 199; Draper v. Atlanta Indep. School System, 518 F.3d 1275, 1288 (11th

Cir. 2008); Jana K. v. Annville-Cleona School Dist., 39 F. Supp. 3d 584, 602 (M.D. Pa. 2014); P.
v. Newington Bd. of Educ., 512 F. Supp.2d 89, 111 (D. Conn. 2007).

81.    Although Gwen's Parents actively advocated for an IEP and Section 504 Service
Plan in this instance, even a parent's failure to participate in a meaningful manner in the IEP
process will not excuse a District's failure to institute an appropriate IEP or 504 Plan. M.C., 81
F.3d at 397 ("[A] child's entitlement to special education should not depend upon the vigilance of
the Parents (who may not be sufficiently sophisticated to comprehend the problem).... Rather, it is
the responsibility of the child's teachers, therapists, and administrators -- and of the
multi-disciplinary team that annually evaluates the student's progress -- to ascertain the child's
educational needs, respond to deficiencies, and place him or her accordingly"); Warren G. v.
Cumberland Valley School Dist., 190 F.3d 80 (3d Cir. 1999); Susquenita School Dist. v. Raelee S.,
96 F.3d 78 (3d Cir. 1996); Lague v. District of Columbia, 130 F. Supp.3d 305, 316 (D.D.C. 2015).

82.    The Supreme Court has determined the IEP to be the "primary vehicle" and the
"centerpiece of the statute's education delivery system for disabled children," and to embody the
substantive standard for School Districts' obligation to provide FAPE to children with
disabilities. Honig v. Doe, 484 U.S. at 311. Therefore, when an eligible child with a disability is
denied an appropriate IEP, the child is denied FAPE.

83.    "Education" extends beyond discrete academic skill, and includes the social,
emotional, behavioral, and physical progress necessary to move the child toward meaningful
independence and self-sufficiency consistent with the child's cognitive potential. M.C., 81 F.3d at
393-394; Polk, 853 F.2d at 181-182; Kruelle v. New Castle County School Dist., 642 F.2d 687,
693 (3d Cir. 1981). For education to be appropriate, it must offer a child the opportunity to make

23

meaningful progress in *all* relevant domains under the IDEA, including behavioral, social, and emotional. M.C., 81 F.3d at 394; Ridgewood, 172 F.3d at 247. In addition, an IEP must be reasonably calculated "to enable the child to receive meaningful educational benefits in *light of the student's intellectual potential*." G.D., 832 F. Supp.2d at 465 (citing P.P. v. West Chester Area School Dist., 585 F.3d at 729-30 (emphasis added)). See also Polk, 853 F.2d at 182, 184 (IDEA requires that an IEP provide "significant learning" and "meaningful benefit").

84.     The United States Supreme Court in its recent decision in Endrew F., 137 S. Ct. 988, emphasized that IDEA requires *far more* than a program calculated to allow a student to make "*some* progress." Id. at 997, 1000-01 (emphasis added). Instead, IDEA "requires an educational program reasonably calculated to enable a child to make progress *appropriate in light of the child's circumstances*." Id. at 999 (emphasis added), and that a child's progress must be assessed with consideration of the child's educational *potential*, see Polk, 853 F.2d at 182; Endrew F., 137 S. Ct. at 999, through an "educational program … appropriately ambitious in light of her circumstances," as minimal "progress from year to year can hardly be said to have been offered an education at all. The goals may differ, but every child should have the chance to meet challenging objectives." Id. at 1000 (emphasis added). The progress standard set forth in Endrew F. is entirely consistent with, and expanded upon, the standard that has been applied for many years in this Circuit, requiring that a student must receive a program that is reasonably designed to allow a student to make *meaningful* educational progress and achieve "significant learning." Brandywine Heights Area School Dist. v. B.M., 248 F. Supp.3d 618, 632 (E.D. Pa. 2017) (citing Endrew F.; L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 390 (3d Cir. 2006) (emphasis added)).

85.     A student with a disability must also be provided a FAPE under Section 504.

"Like the IEP, a § 504 Plan is the mechanism for providing a FAPE under § 504." Lauren G. v. West Chester Area School Dist., 906 F. Supp.2d 375, 391 (E.D. Pa. 2012). Cf. Breanne C. v. Southern York County School Dist., 732 F. Supp.2d 474, 478 (M.D. Pa. 2010) (Section 504 Agreement, "like an IEP, is meant to ensure that [a student with a disability] is provided with a FAPE"); accord S.M. v. School Dist. of Upper Dublin, 2011 WL 3678325 at *1 (E.D. Pa. Aug. 18, 2011).

86.     Pursuant to the above standards, the District unquestionably failed in its responsibilities to Gwen. An award of compensatory education is warranted for the time period at issue, and the Hearing Officer erred in concluding to the contrary. When a School District fails to provide FAPE, it is well-settled that compensatory education is an available remedy for the student under the IDEA or Section 504. Lester H. v. Gilhool, 916 F.2d 865, 868-69 (3d Cir. 1990); Ridgewood, 172 F.3d at 250 n.11; M.C., 81 F.3d at 397. Compensatory education is designed to provide eligible students with the benefit of the services they should have received pursuant to a FAPE. Lester H., 916 F.2d at 873 (award of compensatory education merely compensated the student for an inappropriate placement, belatedly allowing student to receive the remainder of her FAPE). The amount of compensatory education is calculated by finding the period of deprivation of special education services and excluding the time reasonably required for the School District to rectify the problem. M.C., 81 F.3d at 397. Thus, compensatory education is an in-kind remedy intended to provide educational services denied a child by a School District's failure to provide a FAPE. Lester H., 916 F.2d at 873. The Third Circuit has recently found that an appropriate remedy for a failure to provide FAPE is "the establishment of a fund to be spent on the child's education." D.F. v. Collingswood Borough Bd. of Educ., 694 F.3d 488, 498 (3d Cir. 2012). The

court in <u>G.L.</u> also made clear that any award of compensatory education is intended to "make whole" a child for a School District's failure to provide FAPE, even if the period of deprivation extends beyond the limitations period.

87.    Here, the District failed to meet Gwen's needs and thereby deprived Gwen of FAPE. Accordingly, she is entitled to compensatory education for the entire period of deprivation, and the Hearing Officer erred in ruling otherwise.

88.    Because the District violated IDEA by failing to provide Gwen a FAPE, it also violated Section 504. Therefore, the Hearing Officer erred in denying relief under Section 504.

89.    Under Section 504, recipients of federal funds such as the District are required to "provide a free appropriate public education [FAPE] to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a). The term "appropriate education" is defined as "the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of the handicapped persons as adequately as the needs of non-handicapped persons are met and (ii) are based on adherence to the procedures that satisfy the requirements of Section 104.34, 104.35, and 104.36." 34 C.F.R. § 104.33(b).

90.    Section 504 prohibits the exclusion of, or discrimination against, handicapped persons in federally-funded programs such as public education. Section 504 and its regulations require the identification of all disabled children and the provision of appropriate educational services. 29 U.S.C.§ 794; 34 C.F.R. § 104.1 <u>et seq.</u> Failure to provide accommodations, supplemental services and FAPE constitutes unlawful discrimination for purposes of Section 504.

91.    Under Section 504, a "handicapped person" is defined as "any person who has a

physical or mental impairment which substantially limits one or more major life activities." 34
C.F.R. § 104.3. The term "physical or mental impairment" is defined as "any physical or
psychological disorder such as . . . emotional or mental illness and specific learning disabilities"
Id. The term "major life activities" is defined as "functions such as caring for one's self ... learning,
and working." Id.

92.     Section 504 provides specific requirements for public school systems to protect all
handicapped students, even those who may not qualify under the categorical listings of IDEA.
Section 504 requires that "a public elementary or secondary education program shall annually
undertake to identify and locate every qualified handicapped person residing in the recipient's
jurisdiction who is not receiving a public education and take appropriate steps to notify
handicapped persons and their Parents or guardians of the recipient's duty under this subpart." 34
C.F.R. § 104.32; Ridgewood, 172 F.3d at 253; W.B., 67 F.3d at 492. The District must identify all
children who are suspected of having a disability and must also ensure that its evaluations to
determine eligibility for services occur within a reasonable time after school officials are notified
that a child is likely to have a disability. Id. at 501.

93.     "When a state fails to provide a disabled child with a free and appropriate
education, it violates the IDEA. However, it also violates [Section 504] because it is denying a
disabled child a guaranteed education merely because of the child's disability. It is the denial of an
education that is guaranteed to all children that forms the basis of the claim." Andrew M. v.
Delaware Cty. Office of Mental Health and Mental Retardation, 490 F.3d 337, 350 (3d Cir. 2007).

94.     Thus, the substantive requirements of Section 504 in the education context are
largely, but not entirely, equivalent to the requirements under the IDEA. James S. v. School Dist.

27

of Phila., 559 F. Supp.2d 600, 620 (E.D. Pa. 2008) (citing Molly L. v. Lower Merion School Dist.,

194 F. Supp.2d 422, 426 (E.D. Pa. 2002)). Section 504 "is broader in scope [than [IDEA].... The

definition of 'individual with a disability' under § 504 of the Rehabilitation Act is broader in

certain respects than the definition of a 'child with [a] disabilit[y]' under the IDEA." Muller v.

Commission on Special Educ. of E. Islip Union Free School Dist., 145 F.3d 95, 100 n.2 (2d

Cir.1998). A school may violate Section 504 independent of any violations of IDEA. Lauren G. v.

West Chester Area School Dist.,906 F.Supp.2d 375 (granting tuition reimbursement for School

District's failure to provide FAPE under Section 504 during period of time for which no relief was

granted under IDEA).

      95.    Under Section 504, placement procedures require a school to interpret "evaluation

data and in making placement decisions, a recipient shall (1) draw upon information from a variety

of sources, including aptitude and achievement tests, teacher recommendations, physical

condition, social or cultural background, and adaptive behavior, (2) establish procedures to ensure

that information obtained from all such sources is documented and carefully considered, (3) ensure

that the placement decision is made by a group of persons, including persons knowledgeable about

the child, the meaning of the evaluation data, and the placement options, and (4) ensure that the

placement decision is made in conformity with 104.34." 34 C.F.R. § 104.35 (c).

      96.    To establish a violation of Section 504, a plaintiff must prove that: (1) he is

"disabled" as defined by the Act; (2) he is "otherwise qualified" to participate in school activities;

(3) the school or the board of education receives federal financial assistance; and (4) he was

excluded from participation in, denied the benefits of, or subject to discrimination at, the school.

Ridgewood,172 F.3d at 253; Andrew M., 490 F.3d at 350.

28

97.     Gwen is a student who, at all times relevant to this Complaint, is and was disabled, and is and was otherwise qualified to participate in, and receive equal benefits from, the Defendant's educational programs with appropriate instruction, accommodations and supplemental supports for purposes of Section 504.

98.     Defendant's failure to offer Gwen a non-discriminatory, appropriate educational environment resulted in her being excluded from participation in, denied the benefits of, or subject to discrimination at, her educational program.

99.     Defendant is the recipient of federal financial assistance.

100.    The Hearing Officer erred in not awarding relief under Section 504. The evidence established that the District violated Section 504 by failing to offer Gwen an appropriate program for the time period at issue.

101.    Because the District violated Section 504, it also violated the ADA. The ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." The Third Circuit has held that the ADA "extends the nondiscrimination rule of [Section 504] to services provided by any 'public entity' (without regard to whether the entity is a recipient of federal funds)." Jeremy H. v. Mount Lebanon School Dist, 95 F.3d 272, 279 (3d Cir. 1996). That court held that "the remedies, procedures, and rights" applicable to Section 504 claims are the same as those under the ADA. Id.   Although the analysis of 504 and ADA claims is similar, there are, however, significant differences as to causation.   The court in Lamberson v. Pennsylvania, 963 F. Supp.2d 400 (M.D. Pa. 2013), discussed causation in a discrimination context under Section

504 and the ADA:

> Although the elements of a Title II ADA claim and a Section 504 RA claim are largely the same, there is a variation in the causation provisions of each statute. Specifically, the ADA precludes government discrimination "by reason of" an individual's disability while the RA prohibits such conduct "solely by reason of" an individual's disability. *See* 29 U.S.C. § 794(a); 42 U.S.C. § 12132. The omission of the word "solely" in the ADA indicates that Congress intended for this statute to have a less stringent causation requirement compared to Section 504. See Maples v. Univ. of Tex. Med. Branch at Galveston, 524 Fed. Appx. 93, 94 n. 2 (5th Cir. 2013).

> With respect to the ADA's less stringent causation requirement, the Third Circuit Court of Appeals has held that "the ADA's 'by reason of' language requires" the plaintiff to "demonstrate that, ***but for*** the failure to accommodate, he would not be deprived of the benefit he seeks." Muhammad v. Court of Common Pleas of Allegheny Cnty., 483 Fed. Appx. 759, 764 (3d Cir. 2012). In fact, courts are prohibited from applying mixed-motive analysis in lieu of requiring the plaintiff to establish but-for causation unless the particular anti-discrimination statute permits otherwise.   Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 175-76 (2009).

Lamberson, 963 F. Supp.2d at 412 (emphasis added). "The existence of an alternative cause ... may not necessarily be fatal to an ADA claim so long as disability 'played a role in the ... decisionmaking process and ... had a determinative effect on the outcome of that process.'" New Directions Treatment Servs. v. City of Reading, 490 F.3d 293, 300 n. 4 (3d Cir.2007) (reversing the denial of summary judgment in favor of plaintiff in part because the District Court improperly applied Section 504's sole causation requirement to plaintiff's ADA claim, which required only "but for" causation).

102.     Gwen is a qualified individual with a disability for purposes of the ADA. As set forth above, the District excluded Gwen from participation in, and denied her the benefits of the services, programs or activities of, a public entity. The District failed to ensure that Gwen was provided with appropriate educational and related services, accommodations and supplemental

services which she required in order to have access to the District's programs and services and to make appropriate developmental and educational progress equal to that provided to children without disabilities in violation of the ADA.

103.    The IDEA provides that an aggrieved party has the right to bring a civil action in federal District Court, which conducts an independent review of the administrative record and any additional evidence presented by the parties. P.S., 381 F.3d 198, Susan N., 70 F.3d at 756-757; Delaware County Intermediate Unit v. Martin K., 831 F. Supp. 1206, 1220 (E.D. Pa. 1993). See also 20 U.S.C. § 1415(i)(2); 34 C.F.R. § 300.516(c)(3).

104.    Moreover, Section 504, IDEA, and the ADA all permit recovery of reasonable attorneys' fees by Parents who prevail in an action or proceeding thereunder. 42 U.S.C. § 12205; 20 U.S.C. 1415 § 615 (i)(3)(B); 34 C.F.R. § 300.517; 29 U.S.C. § 794a; Andrew M. v. Delaware County Office of Mental Health/Mental Retardation, 2005 WL 783070 at *15 (E.D. Pa. 2005) (attorneys' fees recoverable under Section 504); Daniel S. v. Scranton School Dist., 230 F.3d 90, 95 (3d Cir. 2000) (attorneys' fees recoverable under IDEA); Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311 (3d Cir. 2006) (attorneys' fees recoverable under the ADA). Section 504 and the ADA additionally permit more expansive costs, including expert witness fees. L.T. v. Mansfield Twp. School Dist., 2009 WL 248818139 at *2 (D.N.J. Aug. 11, 2009) ("plaintiffs are entitled to reimbursement of their expert fees for their prevailing party status on their Rehabilitation Act claim"); M.M. v. School Dist. of Philadelphia, 142 F.Supp.3d 396, 413 (E.D. Pa. Nov. 3, 2015) ("Plaintiffs are entitled to recover expert fees under Section 504 and/or the ADA").

105.    The IDEA clearly requires an independent review of the administrative decision and permits a court to grant the relief sought by Plaintiffs, since the statute expressly endows

courts with broad authority to grant "such relief as the court determines is appropriate." 20 U.S.C.

§ 1415(i)(2)(A); 34 C.F.R. § 300.516(c)(3). The IDEA further provides that federal courts hearing

such matters "shall hear additional evidence at the request of a party." 20 U.S.C. §

1415(i)(2)(C)(ii).

106.    The Hearing Officer erred in his decision by, *inter alia*:   (1) failing to find Gwen

eligible for special education under IDEA and/or for accommodation under Section 504; (2)

concluding that the District did not violate its obligations to identify Gwen as a child with a

disability (i.e., "Child Find"); (3) finding that the District is not obliged to pay for compensatory

education; (4) concluding that the District is not responsible for compensating the Family for the

IEE obtained and paid for by the Parents due to the District's inadequate ER; and (5) failing to

even consider, and then to grant, the Family's request to find the District responsible for

compensating the Family for the many years of private tutoring the Family has paid for (even at

times at the District's request), just to allow Gwen to keep up with her "slow" classroom reading

group as supplemented by the District's long-term maintenance of short-term Title I pull-out

reading support.

107.    In his decision, this Hearing Officer made many unsupported, false, and even

insulting findings. For example, he states that the Parents' due process complaint letter "was

inartfully drawn[,] appearing to have been cobbled together from a formbook", decision at 3. This

statement is false, contrary to the evidence, and offensive. The record shows instead that the

Family's due process complaint letter is an articulate and counseled pleading that is in no way

"cobbled together from a formbook."

108.    The Hearing Officer erred in grossly mischaracterizing both the ER and the IEE in

32

myriad ways. For example, the decision states that the IEE, prepared by a Ph.D.-level licensed and school-certified psychologist whose qualifications were non-medical and fully stipulated to, "looked at the student through a medical lens" and was focused on "the student's weaknesses," while the non-Ph.D. School District employee psychologist's ER "looked at the student through an educational lens" and "looked at the overall performance of the whole student." The evidence is contrary to these false statements, and actually, the exact opposite is true.

109.    Rather than looking at the whole child, the ER found weaknesses in Gwen's areas of disability and made bizarre excuses for them. It, and the Decision of the Hearing Officer, wrongly credited Gwen's subjective classroom language arts grades more than her scores on normed, objective assessments in her areas of weakness (that are lower than expected given her average intelligence and directly contradict her subjective classroom grades), to find that Gwen has no disability and is not eligible. This is clear error.

110.    The Hearing Officer's decision to give the ER more weight than the IEE, and to find the testimony of District psychologist/employee Ms. Katsouras more persuasive than that of the Parents' independent psychologist, Dr. Schmidt, wrongly rested on these erroneous and factually mistaken mischaracterizations. Therefore, those determinations must also be rejected, and this Court should directly hear these two witnesses.

111.    Due to the Hearing Officer's grossly inappropriate, incorrect, and wrongly-grounded determinations, Parents respectfully offer and suggest to this Court that it should itself hear live testimony from Dr. Schmidt and Ms. Katsouras, in order to make its own determinations as to weight and credibility.

112.    The Hearing Officer erred by allowing the District to use the RTI Process to find

Gwen ineligible where the District acknowledged it "is not approved by the State to use the response to intervention model for identification purposes." Decision at 4, 19-22. This is, in effect, an example of the Hearing Officer overruling the State, by allowing the District to use a RTI model.

113.    The Hearing Officer erred by finding that the District's use of short-term Title I Reading Support over a long period could not be utilized as evidence of Gwen's disability or the District's notice thereof, incredibly stating:   "It would be highly unfair to *punish* a district for providing additional assistance to students who have some difficulty in reading but are not necessarily suspected of having a disability, particularly where the parents expressly requested such help for the student upon enrollment."[2]

114.    The Hearing Officer egregiously erred by concluding that "the appropriate remedy for a [C]hild [F]ind violation would consist *only* of an order to evaluate the child." Decision at 22 (emphasis supplied). This is utterly false and shows an extreme misunderstanding of the law on the part of the Hearing Officer. Under this logic, if a School District fails to provide services to a child with disabilities for many years because it failed to ever evaluate and identify the child, the only remedy would be an evaluation -- not compensatory education or tuition reimbursement. The statement is directly contrary to *hundreds* of cases that grant compensatory education and tuition reimbursement for child-find violations. It is also contrary to the unequivocal statement of the

---

[2] For a recent example of the same District using the same RTI process but in front of a different Hearing Officer, leading to a different ruling, see L.Y. v. West Chester Area School District, ODR #21315-18-19 (March 27, 2019), available at: https://odr-pa.org/uploads/hearingofficerdecisions/21315-18-19.pdf

United States Supreme Court that "a reading of the Act [IDEA] that left Parents without an adequate remedy when a School District unreasonably failed to identify a child with disabilities would not comport with Congress' acknowledgment of the paramount importance of properly identifying each child eligible for services." T.A., 557 U.S. at 245.

115.    The Hearing Officer erred in failing to consider or rule upon the appropriateness of the District's ER of Gwen, and in failing to consider evidence of anything occurring prior to September of 2016, based on the Hearing Officer's incorrect decision regarding IDEA's statute of limitations. Decision at 3, 19-21. The Parents' due process complaint and argument at the hearing made clear that their claims included all time since the District was informed of Gwen's disability, several months before September of 2015, when Gwen was first enrolled in the district. Contrary to the Hearing Officer's statement, there appears to have been no record agreement during the hearing to limit the period of District liability from September of 2016 to the date of the hearing. However, even if there had been such an agreement, such evidence would have been required to be considered as competent evidence of the notice to the District of Gwen's disability. The statute of limitations acts as no barrier to the admission or consideration of relevant evidence, and indeed, the Hearing Officer allowed such evidence to be presented at the hearing. Parents are entitled to present relevant evidence, ***and to have it considered***, as it bears upon the District's awareness of, and non-response to, Gwen's disability from before September of 2016. This includes Gwen's first-grade experience, which the Hearing Officer refused to consider.

116.    The court in G.L. v. Ligonier Valley School Dist. Auth., 802 F.3d 601 (3d Cir. 2015), held that if Parents file a Due Process complaint within IDEA's statute of limitations, i.e., within two years of the date the Parents knew or should have known of the District's statutory

violations, the student is entitled to a "complete remedy" for the District's violations for the *entire* period of educational deprivation, without reference to IDEA's limitations period. Id. at 625-26.

117.    The Hearing Officer found that the Parents' claims prior to September of 2016 -- two years prior to the filing of the Due Process complaint -- were barred by IDEA's statute of limitations. This ruling was clearly incorrect. Pursuant to the Third Circuit's decision in G.L., the IDEA limitations period runs from the date on which a parent has knowledge or notice of the "injury" to the child by reason of the School District's failure to deliver a FAPE. G.L., 802 F.3d at 604-05, 607-08, 611-15, 618, 620, 625-26. See also E.G. v. Great Valley School Dist., 2017 WL 2260707 (E.D. Pa. May 23, 2017) (per G.L., IDEA statute of limitations does not run from date of School District's "action," but on the date that the Parents knew or should have known that the action caused an educational injury to their child).

118.    The evidence was clear that the Family did not know, and should not have known, of the inappropriateness of Gwen's education in public school until they became aware of Gwen's educational needs and entitlement upon receiving Dr. Schmidt's IEE of May 16, 2018. Parents filed in September of 2018, well within two years of that date. The complaint was therefore timely (which is undisputed), and must address the entire period of educational deprivation, including the period *before* the "knew or should have known" date. G.L., 802 F.3d at 624-26 (compensatory education must cover entire period of educational deprivation and "make the child whole" with a "complete remedy" for a School District's violations, without reference to IDEA's limitations period). Therefore, the Hearing Officer's ruling that claims before September of 2016 are time-barred under IDEA's statute of limitations, is blatantly incorrect and should be reversed. Such claims include the inappropriateness of the District's refusal to evaluate Gwen for eligibility

when she was in first grade, when Parents asked for that evaluation because they intended to enroll her in the District even though they had not yet enrolled her, and the inappropriateness of her education during the 2015-16 school year (her second-grade year). Appropriate relief should be awarded for those violations to the extent necessary to make Gwen whole for the educational deprivations caused by those violations.

119.    The Hearing Officer failed entirely to rule upon the Parents' request for tutoring reimbursement, which was contained in the due process complaint letter.   Because the Hearing Officer failed to rule on that issue entirely, although evidence was taken on it, this Court should review it *de novo*.

120.    The evidence was clear that Gwen required special education and accommodation to address her educational deficits, and the District's ER, which concluded to the contrary, was therefore inappropriate under IDEA. The Hearing Officer erroneously found that the ER analyzed the eight domains involved in a specific learning disability determination. Yet the required section for analyzing these domains – which ***must*** be filled out in order to evaluate eligibility for Specific Learning Disability, even by its own terms – is ***entirely blank***. The ER thus failed to comprehensively evaluate Gwen in all areas of suspected need, and many of the instruments used in the ER were not standardized. It did not adhere to the requirements for an appropriate evaluation in the IDEA and its implementing regulations, contrary to the findings of the Hearing Officer. See 34 C.F.R. §§ 300.301 – 300.310.

121.    The Hearing Officer's conclusions that the District's ER was comprehensive, thorough, and based on technically sound, reliable, and valid instruments, are therefore incorrect.

122.    The Hearing Officer's statements that the IEE "failed to consider the student's

grades" and "school performance" and is "not comprehensive and thorough" are unjustified and simply false. The IEE reviewed the District's ER, considered reports from Gwen's fourth-grade teacher that her academic skills were in the average or above-average range, and reviewed her second- and third-grade report cards, finding that "Her grades have ranged from As to Cs with mainly higher grades in the A/B range."). The IEE also included a highly detailed classroom observation narrative, in contrast to the ER's one-half page account. Moreover, Gwen's school performance, inclusive of actual classwork, was reviewed by Dr. Schmidt as part of her testimony. The error of the Hearing Officer's logic on this point is underscored by the absence of consideration of Gwen's work product by the District's psychologist in its ER.

123.    The Hearing Officer cites no evidence for his characterization of the IEE as "medical," and there is absolutely none. The IEE is a thorough educational neuropsychological school evaluation by a qualified and experienced school psychologist -- not a doctor or nurse -- whose qualifications were stipulated to. The IEE also focuses on Gwen's overall classroom performance.

124.    Nor did the IEE focus exclusively or even primarily on the student's weaknesses, contrary to the Hearing Officer's mischaracterization (although the reason for both it and the ER was to evaluate Gwen's disability, which is a weakness that should not be papered over). The IEE contains many passages such as the following: "Gwen gets along very well with her same aged peers; she enjoys social activities and is also able to play on her own. She is artistic, imaginative and creative; one day Gwen would like to be employed as a teacher." "Gwen is pleasant, well behaved and friendly" "Gwen presented as an engaging, adorable, friendly, and cooperative girl who worked hard and wanted to do well. She was polite, helpful and wanted to please the

examiner." "Gwen was hard working, careful and showed self-monitoring throughout testing. Also, she exhibited good attention and sustained mental effort." Among other passages that did not focus on Gwen's weaknesses, the IEE included the following:

> Behaviorally, Gwen was kind, helpful, positive and hard working; she showed good nonverbal communication and reported positive relationships with her family, school and friends. Furthermore, she was engaging and developed a nice rapport during testing. Gwen was attentive and showed self-monitoring skills; in fact, she was quite vigilant, sacrificing efficiency for checking/accuracy, and struggled with slow processing/completion time and performance-based worries/anxieties. Gwen is described by her family as an outgoing, artistic and athletic girl who enjoys helping others; she has a strong work ethic. She always wants to please and be successful.

Id. at 15.

125.    The Hearing Officer's characterization of the school's ER as not focusing on Gwen's weakness but being less "medical" than the IEE and more holistically educational is also a gross mischaracterization, and is belied by the contents and findings in both reports.

126.    The Hearing Officer's determinations concerning the evaluations and implicit findings underlying them are arbitrary and capricious. They are an abuse of discretion. They are contrary to the non-testimonial, extrinsic evidence in the record, as well as to the testimonial evidence. The record read in its entirety compels contrary conclusions.

127.    The Hearing Officer erred by finding that the Family's argument that Gwen is eligible under IDEA is "not supported by the record evidence." This is false. The evidence overwhelmingly supported Gwen's eligibility.

128.    The Hearing Officer erred by finding that Gwen "did not exhibit any red flags that the student had a disability during the student's time in the School District." There were myriad red flags. The Hearing Officer inappropriately placed more weight upon the facts that Gwen's

teachers subjectively awarded her good grades and that she did not misbehave than upon the great weight of objective evidence of her disability and significant struggles. But "as a matter of law, [it is an] err[or to] focus[] on [a student]'s grades while disregarding [the student]'s potential." West Chester Area School Dist. v. Bruce C., 194 F.Supp.2d 417, 421-22 (E.D.Pa. 2002).

129.    The Hearing Officer erred by finding that Gwen did not exhibit anxiety about her disability at school. At the due process hearing, the District introduced the 2017-2018 meeting minutes from the CST that specifically showed that when Gwen was given materials in the same level of the Teachers College Columbia reading assessment that she had achieved the prior year, "she cried and said she didn't understand," so she was moved down one level. Prior to the due process hearing, Gwen's mother was unaware of that incident. She also did not know of the Child Study Team's existence and was not invited to that or any other of its meetings.

130.    Due to these and other errors, the Decision was thoroughly erroneous and should be reversed, and appropriate relief should be awarded.

## CONCLUSION

**WHEREFORE**, the Plaintiffs respectfully request that this Court:

1.      Assume jurisdiction over this action;

2.      Hear additional evidence pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii);

3.      Reverse the Hearing Officer's Decision to the extent it fails to Order the District to provide the requested relief, and reverse the Hearing Officer's ruling dismissing claims and finding evidence inadmissible based on the filing statute of limitations;

4.      Order the District to pay appropriate compensatory education for Gwen's 2015-16 through 2018-19 school years;

5.      Order the District to reimburse the Parents for their out-of-pocket costs for private tutoring for Gwen since entering the District;

6.      Order the District to reimburse the Parents for their out-of-pocket fees for the independent educational expert's time, testimony, and IEE testing;

7.      Order the District to pay Plaintiffs their reasonable attorneys' fees and related costs;

8.      Order the District to find Gwen eligible and develop and IEP;

9.      Declare the District's actions and omissions to be violative of IDEA, Section 504, the ADA; and Pennsylvania law; and

41

9.    Grant such other relief as this Court deems proper.


Respectfully submitted,


Dennis C. McAndrews, Esquire
ID No. 28012


Kimberly A. Caputo, Esquire
ID No. 56993


John W. Goldsborough, Esquire
ID No. 73063


McANDREWS, MEHALICK, CONNOLLY,
HULSE, RYAN AND MALONE P.C.
30 Cassatt Avenue
Berwyn, PA
(610) 648-9300 (phone)
(610) 648-0433 (fax)

Attorneys for Plaintiffs