# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| GWENDOLYNNE, S. | : | |
| THROUGH HER PARENTS JUDY S. and | : | |
| GEOFF S. OF WEST CHESTER, PA | : | 19-cv-3844-JMY |
| | : | |
| vs. | : | |
| | : | |
| WEST CHESTER AREA | : | |
| SCHOOL DISTRICT | : | |

## MEMORANDUM

**Younge, J**                                                    **March 12, 2021**

This is an appeal from the due process decision of a Hearing Officer under the

Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400, *et seq.* ("IDEA") and Section

504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504").  The issue that was

before the Hearing Officer, and is now before this Court, is whether West Chester Area School

District (hereinafter "School District" or "Defendant") met its obligations to the student,

Gwendolynne, under the IDEA and Section 504.  Specifically, Gwendolynne's parents, acting as

Plaintiffs, contend that she was denied a free, appropriate public education when the School

District determined that she was not eligible for special education services.  Plaintiffs further

contend that the School District violated its "Child Find" obligations by failing to evaluate

Gwendolynne for a specific learning disability which, they contend, requires special educational

services.  The Parents further seek reimbursement for the costs of an independent educational

evaluation and other costs that they incurred in relationship to Gwendolynne's education.

Pending before this Court are two cross-motions: (1) Defendant's Motion for Judgment

on the Administrative Record ("Def. Mot.," ECF No. 13), and (2) Plaintiffs' Motion to

Supplement the Record and Motion for Judgment on the Administrative Record.  ("Plfs.' Mot.,"

ECF No. 19.)  The Court will first provide an overview of the IDEA and Section 504.  It will

then discuss the applicable standard of review in administrative proceedings, and the procedural history of this case.  The Court will then summarize the Hearing Officer's findings of fact and conclusions of law.  Finally, the Court will analyze the merits of the parties' motions for judgment on the administrative record with a specific focus on allegations of error averred by the Plaintiffs in their Motion to Supplement the Record and Motion for Judgment on the Administrative Record.  Simply stated, Plaintiffs fail to make a persuasive argument to establish that the decision rendered by the Hearing Officer lacked support in the administrative record. For the reasons set forth below, the Court will grant Defendant's motion and deny Plaintiffs' cross-motion thereby affirming the Hearing Officer's decision.[1]

## I.      IDEA AND SECTION 504 OVERVIEW

### A.      IDEA

In 1975, Congress provided that it would make funds available for state special education programs on the condition that states implement policies assuring a "free appropriate public education" (commonly known as a "FAPE") for all their disabled children.  20 U.S.C. § 1412(a)(1)(A); *see also C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 65 (3d Cir. 2010) ("Under the IDEA, a state receiving federal educational funding must provide children within that state a FAPE.").  "Congress passed the law known today as the [IDEA] 'to assure that all children with disabilities have available to them . . . a [FAPE] which emphasizes special education and related services designed to meet their unique needs[.]'"  *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 756 (3d Cir. 1995) (quoting 20 U.S.C. § 1400(c)).

"A school district provides a FAPE by designing and implementing an individualized instructional program set forth in an Individualized Education Plan ('IEP'), which must be reasonably calculated to enable the child to receive meaningful educational benefits in light of

the student's intellectual potential." *P.P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 729-30 (3d Cir. 2009) (internal quotations omitted); *see also Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 187-204 (1982). "Meaningful benefit" means that a student's program affords the student the opportunity for significant learning in light of his or her individual needs, not simply *de minimis* or minimal educational progress. *Endrew F. v. Douglas Cty. Sch. Dist.*, 137 S. Ct. 988, 1000 (2017); *see also K.D. v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 254 (3d Cir. 2018).

"An IEP is developed through collaboration between parents and school districts, and must include an assessment of the child's current education performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide." *Perkiomen Valley Sch. Dist. v. S.D.*, 405 F. Supp. 3d 620, 624- 25 (E.D. Pa. 2019) (internal quotation marks and citation omitted). If "parents believe that the school district is not providing a FAPE for their child, they may unilaterally remove him [or her] from the school, enroll him [or her] in a different school, and seek tuition reimbursement for the cost of the alternative placement." *Munir v. Pottsville Area Sch. Dist.*, 723 F.3d 423, 426 (3d Cir. 2013).

The IDEA provides recourse in the form of an impartial administrative due process hearing. *See* 20 U.S.C. § 1415(f). "If either party is aggrieved by the findings and decision reached after such a hearing, the IDEA further allows that party to file a civil suit in state or federal court." *S.D.*, 405 F. Supp. 3d at 625. "When parents challenge a school's provision of a FAPE to a child, a reviewing court must (1) consider whether the school district complied with the IDEA's procedural requirements, and (2) determine whether the educational program was reasonably calculated to enable the child to receive educational benefits." *Mary T. v. Sch. Dist. of Phila.*, 575 F.3d 235, 249 (3d Cir. 2009).

B.       **Section 504**

Section 504 also requires that Pennsylvania schools provide a free, appropriate public education to children with disabilities.  *See* 34 C.F.R. § 104.33(a).  Specifically, under Section 504, recipients of federal funds must "provide a [FAPE] to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap."  *Id*.; *see also A.B. v. Abington Sch. Dist.*, 440 F. Supp. 3d 428, 434 (E.D. Pa. 2020) ("As for Section 504, it and the IDEA do 'similar statutory work.'") (citing *P.P.*, 585 F.3d at 735).  In other words, Section 504 "is parallel to the IDEA in its protection of disabled students: it protects the rights of disabled children by prohibiting discrimination against students on the basis of disability[.]" *P.P.*, 585 F.3d at 735; *see also* 34 C.F.R. § 104.4.  A student with a disability who is otherwise qualified to participate in a school program, and was denied the benefits of the program or otherwise discriminated against, has been discriminated against in violation of Section 504.  *See S.H. v. Lower Merion Sch. Dist.*, 729 F. 3d 248, 260 (3d Cir. 2013).  A student who claims discrimination in violation of the obligations of Section 504 must show deliberate indifference on the part of the school district.  *Id.* at 263-64.

II.     **STANDARD OF REVIEW FOR ADMINISTRATIVE PROCEEDINGS**

In considering a challenge to an administrative decision on an IDEA claim, district courts employ a "modified *de novo*" standard of review.  *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003).  Under this standard, "although the [d]istrict [c]ourt must make its own findings by a preponderance of the evidence," it "must also afford due weight to the [Hearing Officer's] determination."  *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004); *see also P.P.*, 585 F.3d at 734.  Thus, courts are not free to "substitute

their own notions of sound education policy for those of the educational agencies they review."

*Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 757 (3d Cir. 1995).  Specifically,

> factual findings from the administrative proceedings are to be considered *prima facie* correct, and if a reviewing court fails to adhere to them, it is obliged to explain why.  In addition, if a state administrative agency has heard live testimony and has found the testimony of one witness to be more worthy of belief than the contradictory testimony of another witness, that determination is due special weight.  [T]his means that a [d]istrict [c]ourt must accept the state agency's credibility determinations unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion.

*Shore Reg'l High Sch. Bd. of Educ.*, 381 F.3d at 199.

Further, "claims for compensatory education and tuition reimbursement are subject to plenary review as conclusions of law . . . [W]hether the District fulfilled its FAPE obligations— [is] subject to clear error review as [a] question of fact." *P.P.*, 585 F.3d at 735.  The reviewing court should not, however, "substitute its own notions of sound educational policy for those of local school authorities.  *S.H*, 336 F.3d at 270.  Lastly, the burden of proof is on the party bringing the administrative complaint, a burden that continues on appeal.  *See L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 391-92 (3d Cir. 2006) (citing *Schaffer v. Weast*, 546 U.S. 49, 62 (2005)).

## III.   PROCEDURAL BACKGROUND

Plaintiffs felt that Gwendolynne was eligible for special education and made their first request for an evaluation in fall of 2015 when she enrolled in the School District for second grade.  (Admin. Record, Ex. 7, S-4.)  The School District denied this first request for an evaluation and Plaintiff took no action at that time.  (*Id.*)  In September of 2017, Plaintiff made a second request to have Gwendolynne evaluated to determine if she had a specific learning disability that required special educational services and accommodations.  (*Id.*)  In the fall of 2017, the School District assembled a team to conduct an evaluation.  (*Id.* Ex 7, S-8 (Evaluation Report).)  The School District team issued a written evaluation on November 14, 2017 that was

signed by School District psychologist Peggy Katsouros, Gwendolynne's fourth grade teacher, and Denise Kelly who was a School District reading specialist who worked extensively with Gwendolynne. (*Id.*) The team concluded that Gwendolynne did not have a learning disability and was, therefore, not entitled to special services or accommodations.

On November 27, 2017, Plaintiffs contested the conclusions reached by the evaluation team. (*Id.* S-10.) They hired Kara Schmidt, Ph.D, a developmental neuropsychologist who was licensed and certified in school psychology to perform an evaluation. (*Id.* S-15.) Dr. Schmidt conducted an evaluation and authored a report in which she espoused the conflicting conclusion that Gwendolynne had a specific learning disability and an anxiety disorder. (*Id.*)

Armed with Dr. Schmidt's written evaluation, Plaintiffs then filed a due process Complaint. (*Id.* Ex. 9.) A due process hearing that lasted two days was held before Hearing Officer James Gerl, Esquire on Friday, November 2, 2018 and Wednesday, March 20, 2019. (*Id.*, Ex. 5-6.) Over the of the course of the two-day hearing, the Hearing Officer heard testimony from a number of witnesses including; the Principal of the elementary school that Gwendolynne attended, reading specialist Denise Kelly, School District psychologist Peggy Katsouros, and the fourth and fifth grade teachers who taught Gwendolynne. Gwendolynne's mother also testified at the due process hearing along with her neuropsychological expert, Dr. Schmidt.

The Hearing Officer ultimately found in favor of the School District and ruled that the eligibility committee appropriately found that Gwendolynne was not eligible for special education. (Admin. Dec. and Order.) On August 23, 2019, Plaintiffs filed a Complaint in the Eastern District of Pennsylvania in which they challenge the Hearing Officer's factual and legal conclusions and seek judicial review of the administrative record. (ECF No. 1.) The parties then

filed cross motions for judgment on the administrative record.  (Def. Mot. & Plfs. Mot.)

Plaintiffs made the additional request that the administrative record be reopened and that the

Court hear live testimony, so that it could make its own credibility determinations.  (Brief in

Support Plfs.' Mot. page 32, ECF No. 18 (Argument A).)  In their Brief in Support of the Motion

to Supplement the Record and Motion for Judgment on the Administrative Record, the Plaintiffs

raise seven (7) discrete areas in which they feel the Hearing Officer's decision was erroneous

and should, therefore, be set aside.  These issues are as follows:

A.  The Hearing Officer Seriously Erred as a Matter of Law in Excluding Consideration of
    Evidence Based Upon, and Regarding, the Statute of Limitations, and this Court Should
    Reverse that Decision and Remand the Matter to the Administrative Process.
B.  The Court Should Permit Plaintiff to Further Supplement the Record and then Reverse
    the Hearing Officer's Decision.
C.  The Hearing Officer Erred in Failing to Conclude that the District Violated Its
    Obligations to Identify Gwendolynne as A Child with A Disability (Known as "Child
    Find"), and this Court Should Reverse that Decision.
D.  The Hearing Officer Erred in Failing to Find the District Responsible for Compensating
    the Family for the IEE Obtained and Paid for by the Parents Due to the District's
    Inadequate ER, and this Court Should Reverse that Decision.
E.  The Hearing Officer Erred in Failing to Find Gwendolynne Eligible for Accommodations
    Under Section 504 and the ADA, and this Court Should Reverse that Decision.
F.  The Hearing Officer Erred in Failing to Find that the District is Obliged to Provide
    Compensatory Education, and this Court Should Reverses that Decision.
G.  The Hearing Officer Erred in Failing to Address and Grant the Family's Request for
    Reimbursement for the Many Years of Private Tutoring the Family Obtained (at times at
    the District's Request), and this Court Should Reverse that Decision.

(Brief in Support Plfs.' Mot. (see topic hearings section V. and VI. A – F.)

## IV.     HEARING OFFICER'S DECISION

### A.     Hearing Officer's Factual Findings:

Gwendolynne attended kindergarten at a private parochial school.  (Admin. Dec. ¶ 7.)

After her first year of kindergarten, the Parents and the staff at the private school decided to have

Gwendolynne repeat kindergarten, this time at a second private parochial school.  (*Id.* ¶ 7.)  She

remained at the second private parochial school until she completed first grade and then

transferred to the West Chester Area School District ("District") at the beginning of the 2015-2016 academic school year for second grade. (*Id.* ¶ 8.) The decision to enroll Gwendolynne in West Chester Area School District was largely based on the recommendation of staff at the second parochial school who felt that she would benefit from the more comprehensive level of educational support offered in the public school system. (*Id.*)

Shortly after Gwendolynne enrolled in the School District for second grade, a reading specialist, Denise Kelly, administered the DIBELS reading test which indicated that Gwendolynne needed support. (Transcr. Vol. I. 107-108.) Ms. Kelly then began to work with Gwendolynne. (*Id.* 105-184.) Upon entering third grade, on September 1, 2016, Gwendolynne was administered a QRI-5 reading assessment which showed that she was reading at a third-grade level. (Admin. Dec. ¶ 9.) The District continued to provide additional reading support from a reading specialist who worked with Gwendolynne outside of the classroom four (4) days a week for 30 minutes per session.[2] (*Id.* ¶ 10.) Gendolynne's final mark in third grade was a B+ in reading and an A- in writing. (*Id.* ¶ 11.)

On September 4, 2017, Gwendolynne's parents requested a neurological assessment. (*Id.* ¶ 12.) The District conducted an evaluation and school psychologist Peggy Katsouros issued a report on November 17, 2017. (*Id.* ¶ 13.) Ms. Katsouros found strengths and weaknesses in Gwendolynne's academic skill level, but concluded that she was performing overall at an average grade level standard for fourth grade. (*Id.* ¶ 13.) As a result, the School District eligibility committee determined that she was not eligible for special education because she did not require specially designed instruction.[3] (*Id.* ¶ 14.)

In reaching her conclusions, Ms. Katsouros reviewed QRI test results, the Teacher's College Reading and Writing Assessment, and a variety of other test results. (*Id.* ¶ 13.) Ms.

Katsouros also administered a number of assessment tests including the WISC-V assessment, the Kaufman Test of Educational Achievement, the Woodcock-Johnson Test of Achievement and the Fifer Assessment of Reading.  (*Id.*)  The WISC-V test revealed that Gwendolynne's full-scale IQ was 101—which is in the average range.  The results from her Kaufman Test of Education Achievement placed her in the average range for phonological processing.  (*Id.*)  The Woodcock-Johnson Test of Achievement placed Gwendolynne in the average to below average range while she scored within the average range on the Fifer Assessment of Reading.  In addition to test results, Ms. Katsouros considered progress monitoring data, as well as grades, information provided from teachers and other school records.  (*Id.*)

On November 27, 2017, Gwendolynne's parents emailed Ms. Katsouros to contest the School District's evaluation and object to the District's use of grade-level testing as opposed to the parents' preferred age-level testing.  (*Id.* ¶ 15.)  Gwendolynne's parents also retained the service of Kara S. Schmidt, Ph.D. to conduct an independent evaluation.  (*Id.* ¶ 10.)  Dr. Schmidt is a developmental neuropsychologist who is licensed and certified as a school psychologist. (*Id.*; Admin. Record Ex. 7, S-15.)  In May 16, 2018, Dr. Schmidt produced a report that outlines the results of her neuropsychological evaluation.  (*Id.*)

Dr. Schmidt conducted a number of tests that were similar to the tests conducted by Ms. Katsouros.  (*Id.* ¶ 23.)  Her evaluation revealed similar test scores and data to those obtained by the School District during its evaluation.  (*Id.* ¶ 24.)  Dr. Schmidt's evaluation focused on age-normed standards rather than grade-level normed standards.  (*Id.* ¶ 23.)  Dr. Schmidt concluded that Gwendolynne possessed average intellectual ability.  (*Id.*)  She further concluded that Gwendolynne had a specific learning disability and generalized anxiety disorder.  (*Id.*)  She then made a number of recommendations for specialized education and accommodations.  (*Id.*)  Dr.

Schmidt analyzed Gwendolynne through a medical lens while the School District psychologist and evaluation team applied an educational perspective.  (*Id.* ¶ 25.)

Gwendolynne's grades were A's and B's throughout the time that she was enrolled in the District. (*Id.* ¶ 17.)  In spring of 2017, Gwendolynne's PSSA scores in English language arts and mathematics were basic.  (*Id.* ¶ 18.)  In the spring of 2018, her PSSA scores were proficient in mathematics and science while basic in English language, but her English language skills were closer to proficient than the previous year showing improvement in English.  (*Id.* ¶ 18.) Gwendolynne received an A in reading and a B+ in fourth grade writing.  (*Id.* ¶ 19.)  In fifth grade, for school year 2018-2019, Gwendolynne's reading level was consistently instructional. Gwendolynne receive an A+ for fifth grade with an A- in writing.  (*Id.* ¶ 20.)  Her classroom performance was consistent with grade level standards, and she made progress in her general education classes with support from the reading specialist.  (*Id.* ¶ 27.)

**B.      Hearing Officer's Legal Conclusions:**

The Hearing Officer found that the Gwendolynne's parents were unable to demonstrate that she required special education or a special educational plan under Section 504.  (*Id.* ¶ 6.)  He further found that her parents were not able to demonstrate that the School District violated its Child Find duty.  (*Id.* ¶ 7.)  Finally, the Hearing Officer declined to award compensation damages.

In reaching his conclusions, the Hearing Officer weighed the evidence presented at the due process hearing and gave more weight to the evaluation conducted by the School District because of its educational focus.  (*Id.* page 17.)  The Hearing Officer concluded that an educational focus is more appropriate for purposes of determining eligibility for special education.  (*Id.*)  He found that the evaluation conducted by the School District was

"comprehensive and thorough." (*Id.* page 15.) He wrote, "The evaluation was consistent with all of the requirements specified by IDEA. *See* 34 C.F.R. § 300.304. The School District evaluator considered the student's school performance in conducting the evaluation, including progress monitoring results, as well as grades and information provided by the student's teachers." (*Id.* page 15-16.) The Hearing Officer highlighted the fact that both experts reached different conclusions despite the fact that they were examining similar data from standardized testing. (*Id.* page 17.) He wrote, "Accordingly, the difference in their conclusions concerning eligibility for special education revolve around their different viewpoints . . . The educational focus of the school district evaluator is more appropriate for purposes of a special education eligibility determination, and therefore, it is given more weight." (*Id.* page 17.)

The Hearing Officer further found the testimony of the school psychologist and other district staff more persuasive and credible because of demeanor of the witnesses and the nature of their testimony. (*Id.*) He highlighted the fact that Dr. Schmidt failed to consider Gwendolynne's school performance, her grades, and the results of progress monitoring. (*Id.*) The Hearing Officer also highlighted the fact that there was very little in Dr. Schmidt's report concerning Gwendolynne's overall school performance. (*Id.*)

## V.   DISCUSSION

In reviewing the Hearing Officer's factual findings, the Court has reviewed and considered all evidence within the administrative record, including the Hearing Officer's decision (Admin. Dec.), the November 2, 2018 hearing transcript (Transcr. Vol. I.), the March 20, 2019 hearing transcript (Transcr. Vol. II.), the District's exhibits (S1-S28), Plaintiffs' exhibits (P1-P12), and the Independent Educational Evaluation ("IEE") report authored by Kara S. Schmidt, Ph.D. ("IEE Report,", S-15). This Court also reviewed the supplemental evidence

exhibits A-I attached to the Plaintiff's unopposed Motion to Supplement the Administrative Record.  (Mot. Supplement Admin. Record, Ex. A-I, ECF No. 10.)  This Court finds that the Hearing Officer's critical findings of fact are *prima facie* correct and are supported as a whole by the administrative record.

As to the weight of testimony accorded to each witness who testified during the course of the two-day due process hearing, the Hearing Officer found that between the two witnesses, and especially where the testimony of the witnesses materially differed, the testimony of the School District's psychologist Peggy Katsouros, Ed.S, NCSP, was credited and accorded heavier weight than the testimony of Kara Schmidt, Ph.D.  The Hearing Officer also found the testimony of School District staff persuasive and credible.  This Court accepts the Hearing Officer's credibility determinations and finds that no evidence in the administrative record justifies a contrary determination.

A.     <u>A Review of the Record Fails to Support Plaintiffs' Contention that the Hearing Officer Precluded Evidence Based on a Misapplication of the Statute of Limitations</u>.

Plaintiffs fail to cite to any point in the record where the Hearing Officer ruled that evidence from events that occurred prior to September 2016 would not be considered in reaching a decision on the merits.  There is no indication that the Hearing Officer precluded the presentation of evidence at the due process hearing based on the application of the statute of limitations.  In support of their argument that evidence was precluded, Plaintiffs cite to the Administrative Decision in which the Hearing Officer framed one of the contested issues as, "Did the school district violate its child find duty with regard to the student for the period from September 2016 to the date of the hearing?"  (Admin. Dec. page 3.)  It should be noted that there was nothing in this topic heading to indicate that the Hearing Officer was making an evidentiary ruling; rather, the topic heading framed a contested issue to be decided.

The major problem with Plaintiffs' argument in this regard is that they themselves framed the contested issue in a similar manner at the beginning of the due process hearing.  When addressing the issue of compensation for violation of the IDEA and Section 504, Counsel indicated that they were seeking damages from September 2016 to the date of the hearing.  The transcript from the proceeding reads as follows:

> HEARING OFFICER: Okay.  Before we get to exhibits and opening statements and all that good stuff, prior to the hearing, I asked Counsel to provide a statement of issues.  Before we went on the record, I understand that basically we've agreed that there are three issues.  Would one of you like to state what they are?
>
> MS. GOLDSMITH: Yes.  The first issue is eligibility under Section 504 and/or the IDEA.  The second issue is the compensatory education owed from September 2016 to present under either IDEA and/or Section 504.  And reimbursement for an independent educational evaluation by Dr. Kara Schmidt.

(Transcr. Vol I. page 9.)  Plaintiffs cannot claim error on these grounds given the fact that Plaintiffs themselves highlighted three issues for the Hearing Officer to consider, and the fact that they framed the "child find" obligations in terms of compensation from September 2016 until the date of the hearing.  Furthermore, this Court lacks subject matter jurisdiction over Plaintiffs' complaint to the extent that it is seeks review of issues not raised before the administrative law judge.[4]   Pursuant to the IDEA, failure to raise an issue at the administrative level will result in waiver of the issue in a civil action before a federal district court.  *Id.*

The statute of limitations presents another major impediment to Plaintiffs' ability to pursue claims that accrued prior to 2016, and Plaintiffs fail to adequately address the issue presented by the statute of limitations in their briefing.  Both the IDEA and Section 504 are governed by a two-year statute of limitations.  *P.P.*, 585 F.3d 727.  Claims premised upon the IDEA are "not subject to the continuing violation or equitable tolling doctrines, but instead can be extended only for one of the enumerated statutory exceptions."  *Baker v. S. York Area Sch.*

*Dist.*, No. 08-1791, 2009 U.S. Dist. LEXIS 114375 *20 (M.D. Pa. 2009); *see also Evan H. v. Unionville-Chadds Ford Sch. Dist.*, No. 07-4990, 2008 U.S. Dist. LEXIS 91442 *14 (E.D. Pa. 2008); *J.L. v. Ambridge Area Sch. Dist.*, 622 F. Supp. 2d 257, 269 (W.D. Pa. 2008).

Plaintiffs filed their administrative complaint on September 12, 2018.  (Admin. Record, Ex. 9 (Due Process Complaint).)  Plaintiffs further contend that they first became aware of a problem with the education that was provided to Gwendolynne when they received the neuropsychological report prepared by Lara S. Schmidt, Ph.D., in May of 2018.  (Brief page 14; Admin. Record, Exhibit 9, S-15 page 1 (Schmidt's neuropsychological evaluation dated May 16, 2017).)  Whether the statute of limitations was calculated from May or September 2018 would make little difference in this action where the Hearing Office found that the eligibility committee correctly determined that Gwendolynne did not have a specific learning disability or require special education.  Simply stated the Hearing Officer found no violation of the IDEA or Section 504.[5]

Similarly, any argument made by Plaintiffs that the damage award should extend beyond September 2016 would be equally deficient because no award is warranted in this instance.  *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601 (3d Cir. 2015) (A child's right to compensatory education under the IDEA, upon proof, of violation was not curtailed by the IDEA's statute of limitations because the claim was filed within two years of the date his parents knew or reasonably should have known of his injury).  The Hearing Officer found no violation of the IDEA or Section 504.  Therefore, compensatory damages would not be appropriate.  (See § F herein below.)

B.    The Court Will Not Permit the Plaintiff to Further Supplement the Record with Live
Testimony.

Plaintiffs argue that the administrative record should be reopened and that the Court

should reevaluate the credibility of Plaintiff's expert neuropsychologist, Kara Schmidt, Ph.D,

juxtaposed to school psychologist, Peggy Katsouras, Ed.S, NCSP.  Plaintiffs argue that this

Court should reevaluate the credibility of both witnesses after hearing their live testimony.

(Brief in Support Plfs' Mot. page 32–36.)  Plaintiffs fail to point to any specific error in the

record to establish that the Hearing Officer's credibility determination was erroneous.  Rather,

they seem to argue that the credibility determination was so fundamentally flawed that it is

against the sheer weight of the evidence.  (*Id.*)  At certain points in their briefing, they suggested

that the School District's evaluation was overly reliant on Gwendolynne's grades and the fact

that she was successfully progressing from grade to grade.  (Reply Brief in Support of Motion

for Remand or Judgment on Administrative Record page 8-9, ECF No. 20.)  They also argue that

new evidence produced to supplement the record calls into question the credibility of defense

witness Ms. Katsouras.  (*See* Unopposed Motion to Supplement the Administrative Record, Ex.

A-I, ECF No. 10.)

Regarding the credibility of witnesses, "the Court generally relies on the Hearing Officer

who is in the best position to observe the witness."  *J.E. v. Boyertown Area Sch. Dist.*, No. 10-

2958, 834 F. Supp. 2d 240, 253 (E.D. Pa. 2011); *see also Cty. Sch. Bd. of Henrico Cnty. v. Z.P.,*

399 F.3d 298, 307 (4th Cir. 2017) (finding a hearing officer is not required to explain in detail

why he credits certain witnesses).  As the First Circuit has cautioned, "The court should look

with a critical eye on a claim, such as made here, that the credibility of a witness is a central

issue."  *Town of Burlington v. Dept. of Educ.*, 736 F.2d 773, 791 (1st Cir. 1984); *see also J.E.,*

834 F. Supp. 2d at 256 ("Courts have been cautioned against supplanting the Court's judgment for that of the state agency, with expertise in the field.").

"[F]actual findings from the administrative proceedings are to be considered prima facie correct[,] and the Court "must accept the state agency's credibility determinations unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." *Shore Reg'l High Sch. Bd. Of Educ.*, 381 F.3d at 199 (administrative findings of fact are entitled to due weight and must be considered prima facie correct while credibility findings regarding the live testimony presented at the hearing are entitled to "special weight.") Specifically, this means that a District Court must accept the state agency's credibility determinations "unless the non-testimonial, extrinsic evidence in the record would *justify* a contrary conclusion." *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 529 (3d Cir. 1995).

The Hearing Officer's credibility determination that favored the testimony of Ms. Katsouros over the testimony of Dr. Schmidt was supported by the evidence and testimony presented at the due process hearing. In assessing whether Gwendolynne required specialized curriculum, Dr. Schmidt testified that the test results were consistent on the standardized tests given by the school and herself. (Transcr. Vol. II. page 337, 366.) However, Dr. Schmidt reached the conclusion that Gwendolynne required accommodations and a specialized educational program. For example, when asked about the test results, Dr. Schmidt testified:

> Yes, the numbers, themselves, are highly consistent, I think, across the school and my evaluations… Just the difference between the two evaluations, in general, is that at school, Gwen is monitored more frequently, and there's a lot of what's called curriculum-based assessments in the school evaluations, as well, which I think is an important differential from standardized assessment.

(*Id.* page 406.) Dr. Schmidt went on to distinguish the testing that she conducted from that of the school by testifying, "Well, that's not a standardized assessment, where we know where she's

falling in relationship to her same-age peers or grade equivalent.  It's a curriculum-based

assessment, which is very important, [that] schools use all the time for progress monitoring."

(*Id.* page 407.)

Ms. Katsouros testified that she used a curriculum-based assessment to reach the

conclusion that Gwendolynne did not require specialized instruction under the IDEA.  (*Id.* page

491.)  She specifically took into account Gwendolynne's performance in school and multiple

date points to assess whether Gwendolynne was functioning at grade-level and advancing

appropriately.  (Transcr. Vol. I. 60-61, 86-89.)  Ms. Katsouros distinguished her conclusions

from those of Dr. Schmidt by testifying that Dr. Schmidt was looking at data through a medical

lens while she was looking through an educational lens.  (*Id.* 60-61.)  She noted that Dr. Schmidt

largely assessed Gwendolynne based on her age-level and not her grade-level.  (Transcr. Vol. II.

388.)

Ms. Katsouros attributed any problems Gwendolynne had with reading and writing to a

normal developmental pattern of strengths and weaknesses in any student that made her eligible

for support, but did not rise to the level of needing specially designed instruction.  (Transcr. Vol.

I. 37-38, 64, 86.)  Ms. Katsouros ultimately reached the conclusion that Gwendolynne was

making progress and was successful with the regular education curriculum and was not a student

who is in need of specially designed instruction.  (*Id.* 90.)  Ms. Katsouros testified:

> ANSWER: As many students do, Gwen has strengths and weaknesses, so we're
> looking for the first prong to determine whether or not she has a disability according
> to IDEA.  Curriculum-based assessments are very important in looking at the
> second prong as to does she need special education services.  So, when I'm looking
> at curriculum-based assessments, these are comparing Gwen's progress throughout
> the year, looking to see if she's meeting the standards for her grade level.  So, it is
> very important to determine that even though she does have some weaker areas,
> that they're not impacting her to the level where she requires special education
> services, because she is making progress, she's performing on grade level, using
> regular education curriculum.

QUESTION: And what about 504 accommodations?  The District went through the process of a 504 and denied the 504; is that correct?

ANSWER: Correct.

QUESTION:  So, the same question, not to the IDEA, meeting specially designed instruction, but maybe needing accommodations.

ANSWER:  Right.  So, when we develop a 504, we're looking to see, again, does the child have a disability, but also is there a need for accommodations.  And through our evaluations, we determined that Gwen is being successful without the use of accommodations.  There's nothing that the team could determine that she would need in addition to what is provided to any regular education student.

(Trasncr. Vol. II. 490-491.)

The Hearing Officer found the testimony offered by Ms. Katsouros more credible based on the education criteria that she used to reach her conclusions, and the fact that it was consistent with other witnesses who testified at the due process hearing.  For example, Gwendolynne's fourth grade teacher testified that she was functioning around grade-level and that she was making progress.  (Transcr. Vol. I. 196, 232.)  The testimony provided by Gwendolynne's fifth grade teacher was consistent with testimony that Gwendolynne was functioning at grade-level. (*Id.* 258, 262, 264.)  Reading specialist, Denise Kelly, who worked with Gwendolynne in second, third, fourth and fifth grades also confirmed Gwendolynne's positive progress with the regular education program that was being provided.  (*Id.* 105-184.)  Ms. Katsouros met with Gwendolynne's teaches and the reading specialist to discuss her progress prior to signing the eligibility evaluation.  (*Id.* 36-37, 73.)

Here, the Hearing Officer's decision to credit the testimony of Ms. Katsouros was supported by the record.  The matter squarely falls in the realm of process and judgment under which the appropriateness of an IDEA evaluation is anchored to compliance with the IDEA's prescribed processes and methodology.  *Perrin v. Warrior Run Sch. Dist.*, No. 13-2946, 2015

U.S. Dist. LEXIS 149623 *28 (M.D. Pa. 2015) *citing L.S. v. Abington Sch. Dist.*, No. 06-5172,

2007 U.S. Dist. LEXIS 73047 *41 (E.D. Pa. 2007) ("The key is in the methodology.  The

conclusions, or lack thereof, cannot be inadequate unless the methodology is inadequate, because

that is the only provision in the law."); s*ee also Parker C. v. West Chester Area Sch. Dist.*, No.

16-4836, 2017 U.S. Dist. LEXIS 104068 *29-30 (E.D. Pa. 2017) (rejecting an inflated grades

argument similar to the argument made by Plaintiffs in the case *sub judice*); and *E.P. v. Howard

Cnty. Pub. Sch. Sys.*, No. 15-3725, 2017 U.S. Dist. LEXIS 133780 *1 (D. Md. 2017).

  With little explanation, the Plaintiffs offer a series of documents in an attempt to establish

that the record should be opened anew and that testimony should be heard.  (Unopposed Motion

to Supplement the Administrative Record, Ex. A-I, ECF No. 10.)  They argue that this

supplemental evidence calls into question the Hearing Officer's credibility determinations

because it shows that Gwendolynne's reading and writing levels were not actually basic on

standardized tests; rather, they argue that the supplemental evidence suggests that her skills were

even further below what one would expect of a student receiving the As and Bs.  (Brief in Supp.

Plfs. Mot. page 35.)  The supplemental evidence offered by the Parents is cumulative and

repetitive of other evidence offered at the due process hearing and does not require that this

Court reopen the record to hear live testimony that was previously presented at the due process

hearing.

  The IDEA says that a district court "shall hear additional evidence at the request of a

party."  20 USC § 1415(i)(2)(c)(ii).  The term "[a]dditional evidence" does not refer to all

evidence, but instead only to evidence that properly supplements the administrative record.  *J.N.

v. S. W. Sch. Dist.*, No. 14-cv-0974, 55 F. Supp. 3d 589, 594 (M.D. Pa. 2014) (a court must

determine whether the party introducing the additional evidence has presented a sufficient

justification for not proffering the evidence at the administrative hearing); *M.C. v. Sch. Dist. of Phila.*, No. 19-0520, 393 F. Supp. 3d 412, 416 (E.D. Pa. 2019) ("the district court should not automatically disallow testimony from all who did or could have testified before the administrative hearing…but the court need not consider evidence that is …cumulative."); *K.D. v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 256 (3d Cir. 2018) (finding no abuse of discretion in preclusion of irrelevant cumulative evidence; and *K.D. v. Downingtown Area Sch. Dist.*, No. 16-cv-0165, 2016 U.S. Dist. LEXIS 115307 *4 (E.D. Pa. 2016).  A district court must evaluate a party's proposed evidence and determine whether it is relevant, noncumulative, and useful with respect to whether Congress's goal has been reached for the child involved.  (*Id.*)  Cumulative and duplicative evidence may be excluded when it would merely embellish testimony provided at the administrative hearing.  (*Id.*)

Plaintiffs' supplemental evidence includes a fifth-grade Student Progress Report for the academic year of 2018-2019 indicating that Gwendolynne received an A and A- in reading and writing.  (Exhibit A); a writing sample with a coversheet indicating it was from a third-grade Benchmark Narrative along with a PSSA scorecard purportedly grading the sample at a level 2 on a scale of 1 to 4 (Exhibit B); a writing sample with coversheet indicating it was from a third-grade Benchmark informative writing test along with a PSSA scorecard purportedly grading the sample at a level 2 (Exhibit C); a writing sample with coversheet indicating it was from a third-grade Benchmark writing test along with a PSSA scorecard purportedly grading the sample at a level 3 (Exhibit D); a writing sample with coversheet indicating that it was from a third-grade Benchmark Narrative writing test along with a PSSA scorecard purportedly grading the sample at a level 2 (Exhibit E); a fourth-grade writing sample with coversheet indicating that it was from a Benchmark test along with a PSSA scorecard purportedly grading the sample at a level 3

(Exhibit F); a fifth-grade writing sample with coversheet indicating that it was from a Benchmark Narrative writing test along with a PSSA scorecard purportedly grading the sample at a level 2 (Exhibit G); a writing sample dated 12/14/18 along with a PSSA scorecard purportedly grading the sample at a level 2 (Exhibit H); and writing sample with a coversheet indicating that it is from a fifth-grade writing assessment and a PSSA scorecard purportedly grading the writing sample at a level 2 (Exhibit I).

The supplemental evidence submitted by Plaintiffs does not alter the analysis of the credibility determinations made by the Hearing Officer.  Calling Dr. Schmidt and Ms. Katsouros to testify before this Court would merely be asking them to present duplicative and cumulative testimony.  The evidence offered by the Plaintiffs does nothing to change this analysis because the supplemental evidence itself is merely cumulative and repetitive of other evidence offered at the due process hearing.  The fact that Gwendolynne scored basic to instructional on English language testing was well established in the record.  Gwendolynne repeated kindergarten and received pullout reading support in second, third, fourth and fifth grade.  (Transcr. Vol. I. 105-184.)  Her Spring 2017 English language assessment on the Pennsylvania System of School Assessment (PSSA) was listed as Basic. (Admin. Record S-18.)  Her PSSA score in Spring 2018 was improved, but still listed as basic.  (*Id.*)

C.    The School District Did Not Neglect Its Obligation to Evaluate Gwendolynne for a Disability Under Its Child Find Duty.

The Hearing Officer's conclusion that the Defendant had not violated its "Child Find" obligation was supported by the evidence and was not erroneous.  The record in this instance does not support Plaintiffs' argument that the School District failed to test or evaluate Gwendolynne for a potential learning disability.  Quite to the contrary, the record establishes that Gwendolynne's developmental English language skills were extensively tested and monitored.

21

Defendant made a conscious decision to leave Gwendolynne in a regular education program with additional reading support as opposed to providing special education and accommodations.

"School districts have a continuing obligation under the IDEA . . . to identify and evaluate all students who are reasonably suspected of having a disability." *P.P.,* 585 F.3d at 738; *see* 20 U.S.C. § 1412(a)(3) (explaining that states must "identif[y], locate[], and evaluate[]" all children with disabilities who are in need of special education, and must develop "a practical method . . . to determine which children with disabilities are currently receiving needed special education and related services"). This is referred to as the IDEA's "child find" requirement. Each state must establish procedures to fulfill this statutory directive. 34 C.F.R. § 300.111. Pennsylvania's "child find" procedures are set forth in 22 Pa. Code. §§14.121 through 14.125.

> As several courts have recognized, however, Child Find does not demand that schools conduct a formal evaluation of every struggling student. *See, e.g., J.S. v. Scarsdale Union Free Sch. Dist.*, 826 F. Supp. 2d 635, 661 (S.D. N.Y. 2011) ("The IDEA's child find provisions do not require district courts to evaluate as potentially 'disabled' any child who is having academic difficulties."). A school's failure to diagnose a disability at the earliest possible moment is not *per se* actionable, in part because some disabilities "are notoriously difficult to diagnose and even experts disagree about whether [some] should be considered a disability at all." *A.P. ex rel. Powers v. Woodstock Bd. of Educ.*, 572 F.Supp.2d 221, 226 (D. Conn. 2008).

*D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 249 (3d Cir. 2012) (holding that there was no violation of child find obligations where the school district consistently monitored, documented, and responded to child's individual needs). A public school is "not required to jump to the conclusion" that a child's school difficulties are reason to suspect a disability. *Id.* at 251 (*citing Broad of Educ. of Fayette Cnty., Ky. V. L.M.*, 478 F.3d 307, 314 (6th Cir. 2007).

The uncontested facts of record establish that Gwendolynne was evaluated by school psychologist Peggy Katsouros after her parents requested a neuropsychological assessment in September of 2017. (Admin. Record. Ex., S-4.) Ms. Katsouros found that Gwendolynne was

functioning at an appropriate level for fourth grade, but that she was a slow reader with poor spelling skills. (Transcr. Vol. I. 78, 81; Admin. Record. Ex. S-8.) Ms. Katsouros described mixed test results showing that Gwendolynne's reading skills were within the normal limits for her IQ. (*Id.* 40-41, 78.) As previously discussed, Ms. Katsouros opined Gwendolynne did not require special education, and Plaintiffs failed to establish that the methodology used by Ms. Katsouros in conduction her evaluation was flawed or inappropriate. *Perrin v. Warrior Run Sch. Dist.*, No. 13-2946, 2015 U.S. Dist. LEXIS 149623 *28 (M.D. Pa. 2015) ("[P]laintiffs challenging adverse child-evaluations must show that the evaluation itself was flawed through an inappropriate process, meaning one that failed to comply with regulatory requirements…"). To the contrary, Ms. Katsouros' conclusions were supported by the other School District witnesses.

Reading Specialist, Denise Kelly, testified that she first met with Gwendolynne in September 2015 when she transferred to the school district. Ms. Kelly further testified that, at that time, she administered a DIBELS reading test which indicated that Gwendolynne needed support. (Trancr. Vol. I. 107-108.) Ms. Kelly testified that she worked with Gwendolynne in second grade and continued to provide regular support throughout third, fourth and fifth grades. (*Id.* 105-184.) However, the support that she provided was not classified as special education. (Id. 174.) Ms. Kelly's testimony was replete with examples of testing and evaluations that she performed to assess Gwendolynne's English language skills. (*Id.*, Ex. S-1.) For example, Ms. Kelly testified that she administered a Qualitative Reading Inventory in September of 2016 which indicated that Gwendolynne was proficient in sight, vocabulary, retelling, oral literal comprehension, inferential comprehension and fluency, and was functioning at grade-level. (*Id.*)

Gwendolynne's fourth grade teacher testified that she was preforming right around grade-level, and that he saw no red flags to indicate that she needed to be evaluated for placement in a

special education program.  (Transcr. Vol. I. 192-193, 196, 230, 232.)  He considered her grades strong for fourth grade and he did not see her struggling to learn or complete her work.  (*Id.* 230-231, 241.)  He was adamant that he did not water down standards or modify his grading system for Gwendolynne.  (*Id.* 229-230.)  He testified that he held her to the same performance expectations as any regular education student.  (*Id.*)

Gwendolynne's fourth grade teacher acknowledged that she received basic scores in testing designed to measure writing skills and that she had problems meeting standards on Benchmark testing in writing, but he did not see this as abnormal for a fourth grader.  (*Id.* 202, 207.)  He highlighted the fact that Gwendolynne had performed above grade-level on several tests designed to measure English language proficiency, and that when looking at a range of test results, Gwendolynne's scores were respectable.  (*Id.* 211, 228.)  He testified to varying test results and academic improvement throughout the school year.  (*Id.* 168, 202; S-14.)  He attributed any weakness in reading and writing to a normal learning process in that learning to read and retain information does not come naturally to all students.  (*Id.* 232.)

The testimony provided by Gwendolynne's fifth grade teacher was consistent with other witnesses who testified at the due process hearing.  She testified that Gwendolynne was doing well and was preforming at grade level.  (*Id.* 264, 477-478.)  She described a well-adjusted student who was able to function with the rest of the class and did not appear anxious.  (*Id.* 260, 477-479.)  She acknowledged that Gwendolynne's writing assessment skills at the beginning of fifth grade were evaluated as basic.  (*Id.* 251.)  However, she did not feel that Gwendolynne required special education.  (*Id.* 262-263.)  She did not see Gwendolynne struggling to complete school work or having problems writing or typing in a timely fashion.  (*Id.* 258, 262.)  She testified that Gwendolynne was able to read aloud and was pretty average for a fifth grader.  (*Id.*

261.)  Gwendolynne's principal testified at the due process hearing and his testimony was consistent with other witnesses who testified on behalf of the School District.  (*Id.* 270-309.)

Simply stated, Gwendolynne was not a student who was permitted to fall through the cracks.  To the contrary, the record established that her academic progress was regularly monitored and she received regular support.

D.     Plaintiffs Are Not Entitled to Compensation for the Independent Educational Evaluation Performed by Kara Schmidt, Ph.D.

Plaintiffs seek financial reimbursement for the independent educational evaluation that they privately funded.  However, they have failed to establish that they followed proper procedure for requesting an independent education evaluation at public expense.  To the contrary, the Hearing Officer specifically found, "They did not follow the procedure established by the IDEA concerning requesting an independent evaluation at public expense."  (Admin. Rec. H.O. Dec. at 23.)  Therefore, the Hearing Officer properly denied their request.

Under the IDEA and Section 504, once the school district completes an evaluation, the parents may object to all or part of the findings, and may request that an independent educational evaluation be completed at public expense.  32 C.F.R. § 300.502(b)(1).  "A parent has the right to an independent educational evaluation at public expense if the parent disagrees with the evaluations obtained by the school."  *P.P.*, 585 F.3d at 740.  However, Plaintiffs cannot recover for an independent educational evaluation sought outside the proper channels, without allowing the school district to challenge the decision in a due process hearing.  *Benjamin A. v. Unionville-Chadds Ford Sch. Dist.*, No. 16-2545, 2017 U.S. Dist. LEXIS 128552 at *52-53 (E.D. Pa. 2017) ("The Court further finds that Parents are not entitled to reimbursement for the IEE because they sought Dr. Schmidt's evaluation outside the collaborative process, and only sought reimbursement after unilaterally contacting Dr. Schmidt.").  "[A] disputed evaluation is a

requirement for a publicly funded [independent educational evaluation.]" *M.S. v. Hillsborough Twp. Pub. Sch. Dist.*, 793 Fed. Appx. 91, 92 (3d Cir. 2019).

E.   The Hearing Officer Committed No Error in Denying Claims Brought Under Section 504 and/or the ADA.

Plaintiffs argue that the Hearing Officer erred when he denied their claims under Section 504 and the ADA.  To obtain relief under Section 504, the evidence must show that a student with a disability, who was otherwise qualified to participate in a program offered by a recipient of federal funding, was denied the benefits of the program or was otherwise subject to discrimination.  *S.H. v. Lower Merion Sch. Dist.*, 729 F.3d 248, 261 (3d Cir. 2013).  A similar standard governs both Section 504 and the ADA.  *Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009).

In this instance, Plaintiffs failed to establish that Gwendolynne was denied a free, appropriate education.  The administrative record fails to establish that any benefits were denied or that discrimination occurred.  For all of these reasons, the Section 504 and ADA claims fail.

F.   No Error Occurred When the Hearing Officer Declined to Award Compensatory Education.

Gwendolynne was not denied a free appropriate public education; therefore, her parents were not entitled to compensation for educational expenses.  "Compensatory education 'aims to place disabled children in the same position they would have occupied but for the school district's violation of IDEA,' by providing the educational services children should have received in the first instance."  *G.L.*, 802 F.3d at 608 (*quoting Reid v. District of Columbia*, No. 04-7051, 401 F.3d 516, 518 (D.C. Cir. 2005)).  "This judicially-created remedy… has received the imprimatur of this Court and reflects the broad discretion that Congress has granted to the courts to remedy the deprivation of the right to a free appropriate education."  *Id.* at 608.

26

It is well settled that compensatory education is an equitable remedy that is available only after a parent has proven that a child has been denied a free, appropriate public education. *M.C. v. Central Regional Sch. Dist.*, 81 F.3d 389, 397 (3d Cir. 1996). Thus, "[a] disabled student's right to compensatory education accrues when the school knows or should know that the student is receiving an inappropriate education." *Lauren W. v. DeFlamminis*, 480 F.3d 259, 272 (3d Cir. 2007). Since Gwendolynne was not denied a free appropriate public education, she would not be entitled to compensatory education.

G.   No Error Occurred When the Hearing Officer Declined to Address or Award Compensation for Private Tutoring.

As previously discussed, Gwendolynne was not denied a free, appropriate public education; therefore, her parents were not entitled to compensation or reimbursement for the expense of private tutoring.

**VI.   CONCLUSION**

For the above reasons, the Court grants Defendant's motion for judgment on the administrative record, and Denies Plaintiffs' motion for judgment on the administrative record. An appropriate order shall follow.

By the Court:

  /s/ John Milton Younge
Judge John Milton Younge

27

---

[1]  The Court has considered the submissions made in support of and in opposition to the parties' respective motions, and finds this matter appropriate for resolution without oral argument.  Fed R. Civ. P. 78; L.R. 7.1(f).

[2]  It is undisputed that Gwendolynne received extra support with reading and writing throughout the time she was enrolled in the School District.

[3]  On or about November 15, 2018, the district convened a meeting and determined that Gwendolynne did not required a Section 504 Plan or special accommodations pursuant to a 504 Service plan.  (Admin. Dec. ¶ 28.)

[4]  The IDEA requires the exhaustion of administrative remedies which means that claims must be raised in the administrative proceedings.  *See* 20 U.S.C. § 1415(f), (i)(2)(A).  This exhaustion requirement extends to non-IDEA claims that seek relief that is available under the IDEA.  *Id.* § 1415(1) ("Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990 [42 U.S.C. 12101, *et seq.*], title V of the Rehabilitation Act of 1973 [20 U.S.C. 790 et seq.], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsection (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter."); *see also Batchelor v. Rose Tree Media Sch. Dist.,* 759 F.3d 266, 272 (3d Cir. 2014) ("Exhaustion of the IDEA's administrative process is also required in non-IDEA actions where the plaintiff seeks relief that can be obtained under the IDEA.").  The Third Circuit has held that § 1983 claims brought by parents claiming retaliation as a result of their efforts to vindicate their child's right to FAPE can be asserted under the IDEA and, thus, must be administratively exhausted.  *S.D. v. Haddon Heights Bd. of Educ.*, 722 Fed. Appx. 119, 126 (3d Cir. 2018).

[5]  It is also undisputed that Gwendolynne's Parents requested that she be evaluated for a learning disability and eligibility for special education when she enrolled in the School District in 2015.  This request was denied, and Plaintiff took no action at that time.  Any claim based on the denial of the initial request for an evaluation in 2015 would be time-barred by the statute of limitations.